S10G1909. RECTOR, WARDENS AND VESTRYMEN OF CHRIST CHURCH IN SAVANNAH et al. v. BISHOP OF THE EPISCOPAL DIOCESE OF GEORGIA, INC. et al.

(718 SE2d 237)

NAHMIAS, Justice.

This case involves a dispute over control of property belonging to the oldest church in Georgia, Christ Church in Savannah ("Christ Church"), with a history spanning almost three centuries. As with so many hierarchical church property disputes that end up in court, this case had its genesis in doctrinal positions taken by the general denomination — the Protestant Episcopal Church in the United States of America ("Episcopal Church") — that were opposed by a majority faction of the local congregation. In March 2006, the leadership of the majority faction, which calls itself "Christ Church in Savannah" or CCS, voted to sever Christ Church's 180-year-old ties with the Episcopal Church and the Episcopal Diocese of Georgia ("Georgia Diocese") without advance notice to the Bishop of the Georgia Diocese. CCS took control of the church property, and in September 2007, the congregation voted to denounce the Episcopal Church and join the Diocese of Soroti in the Anglican Province of Uganda.

The minority faction, which remained loyal to the Episcopal Church, had to find another place to worship. The Georgia Bishop recognized the minority faction, which calls itself "Christ Church Episcopal" or CCE, as the true Christ Church entitled to control of the church property. The Bishop also recognized the rector, wardens, and vestry elected by the minority faction as the rightful leaders of Christ Church. However, CCS refused to surrender the church property.

On November 14, 2007, the Georgia Diocese filed suit against the Rector, Wardens, and Vestrymen of Christ Church in Savannah and the individuals holding those positions (collectively, "CCS"), seeking injunctive relief, damages, and a declaratory judgment that all property of Christ Church is held in trust for the Episcopal Church. The trial court allowed the Episcopal Church to intervene as an additional plaintiff, as well as Christ Church Episcopal and the Rector, Wardens, and Vestry of Christ Church Episcopal (collectively, "CCE"). The parties filed cross-motions for summary judgment.

Applying the "neutral principles of law" doctrine approved by the United States Supreme Court in *Jones v. Wolf*, 443 U. S. 595, 602-606 (99 SC 3020, 61 LE2d 775) (1979), and applied in several of this Court's cases, the trial court granted summary judgment in favor of the Episcopal Church, the Georgia Diocese, and CCE. The Court of Appeals affirmed. See *Rector, Wardens and Vestrymen of Christ Church in Savannah v. Bishop of the Episcopal Diocese of*

*Georgia, Inc.*, 305 Ga. App. 87 (699 SE2d 45) (2010) (*"Christ Church v. Bishop"*). Both the trial court and the Court of Appeals relied in part on OCGA §§ 14-5-46 and 14-5-47 in concluding that the property of Christ Church is impressed with an implied trust in favor of the Episcopal Church.

We granted CCS's petition for certiorari to decide whether the trial court and the Court of Appeals erred in applying the neutral principles doctrine, particularly with respect to OCGA §§ 14-5-46 and 14-5-47. As explained below, although those courts may have erred to some extent in their reliance on OCGA §§ 14-5-46 and 14-5-47, they correctly concluded that neutral principles of law show that the property of Christ Church at issue is held in trust for the benefit of the Episcopal Church.[1]

1. The parties agree that the Episcopal Church is a hierarchical religious denomination with a three-tiered, representative form of government. At the top is a General Convention that meets at least once every three years, which consists of a House of Bishops (essentially all active and retired bishops) and a House of Deputies (four lay delegates and four non-bishop clergy elected by each diocese). Church canons, or laws, must be approved by both houses and are then binding on the Episcopal Church and all of its subdivisions. The middle tier is composed of geographically defined dioceses, each of which is governed by an annual diocesan convention, a bishop, and an elected standing committee. At the lowest tier are parishes, which must associate with the diocese where they are located and must agree to be bound by the constitution and canons of the diocese and the Episcopal Church. Each parish congregation is led by a rector elected by the wardens and vestry or directly by the congregation; the rector must then be approved by the bishop. Parishes elect the wardens and vestry as well as representatives to the diocesan convention.

The parties also agree that legal title to the property of Christ Church at issue is held by the corporate entity known as "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah." See *Wardens & Vestrymen of Christ Church v. Mayor & Aldermen of Savannah*, 82 Ga. 656, 656 (9 SE 537) (1889) (*"Christ Church v. Savannah"*). The question presented is who controls that property.

As we recently reiterated, secular courts may resolve church property disputes. See *Presbytery of Greater Atlanta, Inc. v. Timber-*

---

[1] We note that amicus briefs have been filed in this case by the African Methodist Episcopal Church, the American Anglican Council, the Becket Fund for Religious Liberty, the Church of God, the Greek Orthodox Metropolis of Atlanta, Inc., the Presbyterian Lay Committee, and the South Georgia Annual Conference of the United Methodist Church, Inc.

*ridge Presbyterian Church, Inc.*, 290 Ga. 272 (719 SE2d 446) (2011) (*"Timberridge"*). To avoid First Amendment concerns, Georgia courts apply "neutral principles of law" to determine whether the local congregation or the parent, or general, church in a hierarchical denomination like the Episcopal Church has the right to control local church property, while avoiding any inquiry into religious doctrine. See *Jones*, 443 U. S. at 602-606; *Carnes v. Smith*, 236 Ga. 30, 35-39 (222 SE2d 322) (1976) (following the "neutral principles of law" approach instead of the "formal title" approach advocated by the dissent).[2] These neutral principles include deeds and other instruments of title, state statutes, and documents regarding local and general church government. See *Jones v. Wolf*, 443 U. S. at 602-606; *Timberridge*, 290 Ga. at 276.

In our review of these materials, we keep in mind that the outcome of church property disputes usually turns on the specific facts presented in the record and that the neutral principles factors are interrelated. See *Timberridge*, 290 Ga. at 276-277. Our ultimate goal is to determine " 'the intentions of the parties' at the local and national level regarding beneficial ownership of the property at issue as expressed 'before the dispute erupt(ed)' in a 'legally cognizable form.' " Id. at 277 (quoting *Jones v. Wolf*, 443 U. S. at 603, 606).[3]

---

[2] Not all states follow this approach, nor are they constitutionally required to do so. After *Jones*, state courts appeared to choose between the two United States Supreme Court methodologies. Currently, twenty states and the District of Columbia follow the neutral principles of law approach, nine states follow the hierarchical approach [which simply defers to the decision of the higher authorities within the church], eight follow a hybrid of the two approaches and thirteen are undecided, apparently because they have not been presented with the issue.
*Episcopal Church in the Diocese of Conn. v. Gauss*, 28 A3d 302, 313, n. 11 (Conn. 2011) (citing a survey current through 2008).

[3] Beyond this property trust issue lies the subsidiary question of whether the courts should recognize the rector, wardens, and vestry chosen by CCS or those of CCE as "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah" – the legal titleholder. As the United States Supreme Court reiterated in *Jones v. Wolf*, the First Amendment "requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." 443 U. S. at 602 (citing *Serbian Orthodox Diocese v. Milivojevich*, 426 U. S. 696, 710 (96 SC 2372, 49 LE2d 151) (1976), with a "cf." cite to *Watson v. Jones*, 80 U. S. (13 Wall.) 679, 733-734 (20 LE 666) (1872)). Here, the Episcopal Church through its Georgia Bishop has determined, as a matter of church polity, that the rector, wardens, and vestry selected by CCE are rightfully "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah." Indeed, on October 3, 2007, the Bishop defrocked the rector of Christ Church (who is now the rector of CCS) as an Episcopal Church priest and later appointed a new priest-in-charge. The Bishop also removed the wardens and vestry of Christ Church for violating Episcopal Church law and recognized new church wardens and a new vestry elected by the minority faction of Christ Church that remained loyal to the Episcopal Church. Given our resolution of the property trust issue, we need not reach this subsidiary question, which threatens greater entanglement with internal issues of religious doctrine and polity. See *Bishop & Diocese of Colorado v. Mote*, 716 P2d 85, 99, n. 12 (Colo. 1986) (applying the neutral principles doctrine to determine control over church property first as a way to avoid inquiring into by whom authority over corporate property is to be exercised).

**(a) Title Instruments.**

This case focuses on four parcels of real estate conveyed to "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah" and their predecessors over the course of nearly three centuries. Christ Church acquired title to the church building parcel now known as 28 Bull Street by land grants from the royal government in 1758 and the post-Revolution state government in 1789. Indentures conveyed fee simple interests in the parish house parcel at 18 Abercorn Street in 1940; the first part of the school parcel at 134 Houston Street in 1947; and the parcel containing the two parking lots at the corner of Congress and Drayton Streets in 1994. The remainder of the school parcel was conveyed by warranty deed in 1958.

Although *Jones v. Wolf* speaks mainly of "deeds" and "conveyances" of the sort at issue in that case, see 443 U. S. at 597, 600-601, 603, 606, 609, we understand the first neutral principle to be examination of whatever legal instruments of title were used to transfer the property at issue. See id. at 603, n. 3 (referring to the " 'express terms' of a deed, will, or other instrument of church property ownership" (quoting *Watson v. Jones*, 80 U. S. at 722)).[4] We agree with the trial court and the Court of Appeals that none of the title instruments in this case create a trust in favor of the Episcopal Church. See *Christ Church v. Bishop*, 305 Ga. App. at 89-90. But they also do not preclude the creation of one. See *Timberridge*, 290 Ga. at 277. The Rector, Church Wardens and Vestrymen of Christ Church in Savannah, like other legal titleholders in fee simple, had the authority to place its property in trust or to act in ways that would impress a trust on the property. Given that the instruments of title neither include nor prohibit a trust in favor of the general church, they have a limited role in the neutral principles analysis in this case, and so we turn to consideration of other neutral principles. See id.

---

[4] The dissent appears to have no dispute with this understanding of *Jones v. Wolf*, and indeed the dissent focuses on what it calls Christ Church's "deeds" even though the main property at issue (the church building parcel) was actually obtained not by "deed" but by statutory land grants, while other parcels were obtained by title instruments labeled "indentures" rather than "deeds." See Division 1 (c) (1) and (4) below. At the same time, however, the dissent denies that any church document not labeled a "constitution" may be considered under the neutral principles doctrine. See, e.g., Dis. Op. at 155-156. For this claim, the dissent quotes a passage from *Jones v. Wolf* that refers to "the constitution of the general church" in describing neutral principles – yet that same passage refers only to "deeds," not other instruments of title. See *Jones v. Wolf*, 443 U. S. at 603 (discussing "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property"). Read as a whole, *Jones v. Wolf* does not limit neutral principles analysis to documents with specific titles, but rather directs courts to examine "legally cognizable" documents relating to the ownership and control of church property. See also footnote 8 below.

**(b) Statutes.**
**(1) OCGA §§ 14-5-46 and 14-5-47.**

OCGA § 14-5-46, which is entitled "Conveyances to churches or religious societies confirmed," provides:

> All deeds of conveyance executed before April 1, 1969, or thereafter for any lots of land within this state to any person or persons, to any church or religious society, or to trustees for the use of any church or religious society for the purpose of erecting churches or meeting houses shall be deemed to be valid and available in law for the intents, uses, and purposes contained in the deeds of conveyance. All lots of land so conveyed shall be fully and absolutely vested in such church or religious society or in their respective trustees for the uses and purposes expressed in the deed to be held by them or their trustees for their use by succession, according to the mode of church government or rules of discipline exercised by such churches or religious societies.

When a conveyance that falls within OCGA § 14-5-46 is made to trustees, OCGA § 14-5-47 also applies:

> All trustees to whom conveyances are or shall be executed, for the purposes expressed in Code Section 14-5-46, shall be subject to the authority of the church or religious society for which they hold the same in trust and may be expelled from said trust by such church or society, according to the form of government or rules of discipline by which they may be governed.

The trial court and the Court of Appeals held that OCGA §§ 14-5-46 and 14-5-47 apply to Christ Church's property and support the conclusion that the property is subject to a trust in favor of the Episcopal Church due to "the mode of church government [and] rules of discipline" of the Episcopal Church and the Georgia Diocese. See *Christ Church v. Bishop*, 305 Ga. App. at 90-92. CCS offers at least eight arguments why these two statutes, which date back more than two centuries, see Ga. Laws 1805, pp. 15-16, are inapplicable by their terms, purpose, or historical context.[5]

---

[5] CCS makes the following arguments. First, OCGA § 14-5-46 refers to "deeds of conveyance," not land grants, and the express mention of one thing in a statute implies the exclusion of all other things. Second, the General Assembly did not use "deeds" and "grants" interchangeably during the relevant time period; when it wanted a statute to apply to both, it used "other conveyance" or "conveyances of every kind whatsoever." Third, the General

One or more of CCS's arguments against directly applying OCGA §§ 14-5-46 and 14-5-47 to some or all of the property at issue in this case may have merit. However, as we recently explained, this Court has repeatedly referred to these statutes and their predecessors in resolving church property disputes based on the neutral principles doctrine, even where the text of the statutes did not squarely apply. See *Timberridge*, 290 Ga. at 278 (citing *Holiness Baptist Assn. v. Barber*, 274 Ga. 357, 358-359 (552 SE2d 90) (2001); *Crumbley v. Solomon*, 243 Ga. 343, 344-345 (254 SE2d 330) (1979); and *Carnes*, 236 Ga. at 37-38).

We have treated OCGA §§ 14-5-46 and 14-5-47 and their predecessors as expressing this State's policy of looking to "the mode of church government or rules of discipline" in resolving church property disputes — a policy fully consistent with *Jones v. Wolf*'s focus on local and general church governing documents as an important neutral principle. See *Timberridge*, 290 Ga. at 279 (citing *Jones v. Wolf*, 443 U. S. at 602-606). See also *Barber*, 274 Ga. at 359; *Jones v. Wolf*, 244 Ga. 388, 389 (260 SE2d 84) (1979) ("*Jones II*") (on remand from the United States Supreme Court, "applying [the predecessors to OCGA §§ 14-5-46 and 14-5-47] to the present litigation" by looking to "church documents" to the extent they assist in determining "which persons have the right to enjoy and to use the church property in the event of a schism at the local level"); *Carnes*, 236 Ga. at 38 (stating broadly that "Code Ann. § 22-5507 [now OCGA § 14-5-46] recognizes and validates deeds conveying land for church purposes according to the limitations set out in the deed and for use 'according to the mode of church government or rules of discipline' "). Thus, although the Court of Appeals and the trial court may have erred in reading these statutes as applying directly to

Assembly that enacted the predecessor to OCGA § 14-5-46 was attuned to the distinction between a land grant and a deed because the legislature was rocked by a bribery scandal over the Yazoo land grant in the 1790s. Fourth, the statute was purposely narrow, because it had the limited purpose of validating private conveyances (i.e., deeds) to unincorporated churches, not regulating land grants to incorporated churches; there was no need to pass this statute to validate another one (the 1789 Act granting land to Christ Church). Fifth, legislatures are presumed not to pass redundant laws, and the predecessor to OCGA §§ 14-5-46 and 14-5-47 was unnecessary for congregations incorporated prior to 1803, which were legally cognizable entities to which the General Assembly had already secured property. Sixth, OCGA § 14-5-46 expressly applies only to "lots of land" – realty – conveyed for "erecting churches," but the trial court and Court of Appeals applied them to a parish house, school building, parking lots, and personal property. Seventh, the statute provides that covered property is vested in the church "for the uses and purposes expressed *in the deed*," and to read it as allowing recognition of a trust not reflected in a deed thus contravenes the text. Eighth, the phrase "according to the mode of church government or rules of discipline exercised by such churches" grammatically modifies only the phrase "to be held by them or their trustees for their use by succession"; thus, the statutes require only that *succeeding trustees* be chosen according to church discipline, not that *use of the property* be subject to such discipline.

all of the property at issue, we need not decide that issue or the portion of our certiorari question that posed it, as there was no error under our precedent or *Jones v. Wolf* in looking to "the mode of church government or rules of discipline" in applying neutral principles in this case, as indeed we will do below.

### (2) OCGA § 53-12-20.

CCS and the dissent point to Georgia's generic express trust statute, OCGA § 53-12-20,[6] as proof that there is no trust over the property of Christ Church in favor of the Episcopal Church. As we explained in *Timberridge*, however, requiring strict compliance with OCGA § 53-12-20 to find a trust under the neutral principles analysis would be inconsistent with the teaching of *Jones v. Wolf* that the burden on the general church and its local churches to provide which one will control local church property in the event of a dispute will be "minimal." 443 U. S. at 606. In this regard, the dissent in *Jones* expressed concern that the neutral principles doctrine would unconstitutionally interfere with the free exercise rights "of those who have formed the association and submitted themselves to its authority." *Jones*, 443 U. S. at 618 (Powell, J., dissenting). But the Court rejected that concern in this important passage:

> Nothing could be further from the truth. The neutral-principles approach cannot be said to "inhibit" the free exercise of religion . . . . Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. *The burden involved in taking such steps will be minimal.* And the civil courts will be bound to

---

[6] OCGA § 53-12-20 provides, in relevant part, as follows:

    (a) [A]n express trust shall be created or declared in writing and signed by the settlor . . . .

    (b) An express trust shall have, ascertainable with reasonable certainty:

        (1) An intention by a settlor to create such trust;

        (2) Trust property;

        (3) Except for charitable trusts, a beneficiary who is reasonably ascertainable at the time of the creation of such trust or reasonably ascertainable within the period of the rule against perpetuities;

        (4) A trustee; and

        (5) Trustee duties specified in writing or provided by law.

give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

*Jones*, 443 U. S. at 606 (emphasis added).

Thus, while local churches *may* modify their deeds, amend their charters, or draft separate legally recognized documents to establish an express trust as set forth in OCGA § 53-12-20, that is not the *only* way the parties can ensure that local church property will be held in trust for the benefit of the general church. *Jones v. Wolf* said that it may also be done through the general church's governing law, for example, by making it "recite an express trust." 443 U. S. at 606. As we recognized in *Timberridge*, if hierarchical denominations like the Episcopal Church (and many others) must fully comply with OCGA § 53-12-20 to enable the general church to retain control of local church property in the event of a schism and disaffiliation of a majority faction of a local congregation, then an enormous number of deeds and corporate charters would need to be examined and reconveyed or amended. See *Timberridge*, 290 Ga. at 281. The burden on the general churches, the local churches that formed the hierarchical denominations and submitted to their authority, and their members' free exercise of religion would not be minimal but immense. See id. at 281. That is not how the *Jones v. Wolf* Court envisioned that the neutral principles doctrine would be applied in conformity with the First Amendment.

Nor is the approach proposed by CCS and the dissent consistent with this Court's many cases deciding that the local church held its property in trust for the general church with no mention of OCGA § 53-12-20 or evidence of compliance with its terms. See, e.g., *Timberridge*, 290 Ga. at 281; *Kemp v. Neal*, 288 Ga. 324, 326-329 (704 SE2d 175) (2010) (plurality); *Barber*, 274 Ga. at 358-359; *Crumbley*, 243 Ga. at 344-345; *Carnes*, 236 Ga. at 37-38. Even the dissents in those cases did not rely on OCGA § 53-12-20. As we said in *Timberridge*, "[i]f compliance with OCGA § 53-12-20 were necessary to create a trust in favor of a national church, those cases could not have been decided as they were." 290 Ga. at 281. In addition, until *Timberridge* discussed this point, see id., our numerous church property cases either made no mention of the generic implied trust statutes, now OCGA §§ 53-12-90 to 53-12-93, see, e.g., *Kemp*, 288 Ga. at 326-329 (plurality); id. at 331-334 (Carley, P. J., dissenting in part); *Barber*, 274 Ga. at 358-359; *Crumbley*, 243 Ga. at 344-345, or explained that the requirements of those statutes were *not* met, see *Carnes*, 236 Ga. at 37-38 — and yet the Court still concluded that the local church property was held in trust for the general church.

This case, like previous cases, involves a trust implied under neutral principles of law, even though one aspect of that analysis is

consideration of trust language expressly included in the documents establishing the governmental rules of the general church. See, e.g., *Barber*, 274 Ga. at 359 ("implying a trust" for the benefit of the general church where its discipline expressly provided that the general church "shall hold all church property"). In short, the fact that a trust was not created under our State's generic express (or implied) trust statutes does not preclude the implication of a trust on church property under the neutral principles of law doctrine. See *Timberridge*, 290 Ga. at 281; *Kemp*, 288 Ga. at 326-329 (plurality); *Barber*, 274 Ga. at 358-359; *Crumbley*, 243 Ga. at 344-345; *Carnes*, 236 Ga. at 37-38. Accord *Bishop & Diocese of Colorado v. Mote*, 716 P2d at 100 (explaining that *Jones v. Wolf* "did *not* restrict the inquiry to a search for explicit language of express trust" (emphasis in original)). Indeed, in discussing the neutral principles approach, the *Jones v. Wolf* Court focused on "the state statutes *governing the holding of church property*," 443 U. S. at 603 (emphasis added), of which OCGA §§ 14-5-46 and 14-5-47 are the most prominent in Georgia's Code.[7]

### (c) Local and National Church Documents.

The final neutral principle this Court has normally examined is the governing documents of the local and general churches. "The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, *such as* a church constitution, for language of trust in favor of the general church." *Jones v. Wolf*, 443 U. S. at 604 (emphasis added). See *Carnes*, 236 Ga. at 39 (explaining that " '[a] local church . . . cannot . . . enter a binding relationship with a parent church which has provisions of implied trust in its constitution, by-laws, rules, and other documents pertaining to the control of property, yet deny the existence of such relationship' " (citation omitted)). Like other courts, see, e.g., *Jones v. Wolf*, 443 U. S. at 604 (discussing the corporate charter of the local church and the constitution of the general church), this Court has examined, always in purely secular terms, the general and local church's governmental rules set forth in documents labeled in various ways. See, e.g., *Timberridge*, 290 Ga. at 274 (examining the Articles of Incorporation of the local church corporation and the Book of Order of the parent church); *Ga. District Council of Assemblies of God, Inc. v. Atlanta Faith Mem. Church, Inc.*, 267 Ga. 59, 60-61 (472 SE2d 66) (1996) (reviewing the bylaws of

---

[7] Our many church property decisions also do not mention the litany of other generic statutes cited by the dissent, see, e.g., Dis. Op. at 147-151, nor did any party in this case argue that those statutes were relevant, much less controlling. The dissent's repeated claim that we have somehow created "a new type of implied trust," Dis. Op. at 120, 131, 138, 142, 144, 160, similarly disregards the prior decisions of this Court.

the general denomination); *Crumbley*, 243 Ga. at 343-344 (reviewing the Disciplinary Rules of the parent church); *Jones v. Wolf*, 241 Ga. 208, 211 (243 SE2d 860) (1978) (discussing "documents of church government"), vacated on other grounds, 443 U. S. at 609-610; *Carnes*, 236 Ga. at 37 & n. 16 (reviewing the Book of Discipline of the parent church and noting that the corporate charter of the local church would have been relevant if the local church had one).[8]

Indeed, because the relevant title instruments are often inconclusive and statutes may not be directly applicable, most of our church property cases have ultimately relied on such governing documents to resolve the dispute. See, e.g., *Timberridge*, 290 Ga. at 276; *Crumbley*, 243 Ga. at 345 ("In recent years this court has looked consistently to the requirements of the church discipline in hierarchical denominations to avoid offending the prohibitions of the First Amendment."). But this should come as no surprise, given that our task is to discern " 'the intentions of the parties' at the local and national level regarding beneficial ownership of the property at issue as expressed 'before the dispute erupt(ed)' in a 'legally cognizable form.' " *Timberridge*, 290 Ga. at 277 (quoting *Jones v. Wolf*, 443 U. S. at 603, 606). One would expect those intentions to be revealed in the formal documents that memorialize the relationship between the local and general churches and their property-related rules, as well as the parties' course of conduct under those governing documents.

In this case, it is most revealing (although unfortunately not most succinct) to review the local and general church documents as they were created, amended, and followed over the course of the quarter millennium that Christ Church interacted with a parent denomination before the dispute underlying this lawsuit arose. As the trial court and the Court of Appeals similarly concluded, our review demonstrates that Christ Church has submitted to the authority of the parent church for all of its existence except for the Revolutionary War and subsequent interregnum when Christ Church was actively seeking a new parent church. Moreover, the parent church has always had control over local church property, with that control becoming more and more explicit in the "legally cognizable form" of the Episcopal Church's governing canons, culminating in an express property trust provision (the "Dennis

---

[8] Although the dissent harps on the point, see, e.g., Dis. Op. at 119, 124, 155-156, it does not cite a single case holding that only a church document called a "constitution" may be considered under the neutral principles doctrine. By contrast, the cases just cited, along with numerous other post-*Jones v. Wolf* cases from around the country, have looked to documents setting forth the basic organizational and property rules of the general and local churches, whatever their label. Indeed, requiring churches to put their organizational and property rules in a document called a "constitution" rather than a "Book of Order," "Book of Discipline," "Canons," or the like would raise serious First Amendment concerns.

Canon") in 1979, just after the *Jones v. Wolf* decision invited hierarchical churches to clarify property control with such a provision. See *Kemp*, 288 Ga. at 328 (plurality) (noting that legal commentators have observed that "hierarchical churches, taking their cue from a concurrence in [a 1969 case] and instruction given by the United States Supreme Court in *Jones v. Wolf*, . . . amended church constitutions in the 1970s and 1980s to include a provision that local churches hold their property in trust for the use and benefit of the general church." (citations and footnote omitted)).

Christ Church repeatedly pledged its unequivocal adherence to the discipline of the parent church, including when it organized the Georgia Diocese of the Episcopal Church in 1823 and in its formal corporate Articles of Amendment filed with the State of Georgia in 1918 and its Articles of Incorporation filed in 1981 — two years after the Dennis Canon was enacted. And the record shows that at all times during the 180 years before this dispute began, Christ Church acted consistently with the Episcopal Church's canons regarding its property, demonstrating the local church's understanding that it could not consecrate, alienate, or encumber — much less leave with — its property without the consent of the parent church.[9]

**(1) Founding of Christ Church through the Revolution.**

The church building parcel was originally given to Christ Church in 1733 by the trustees of the Georgia colony, to be part of the Church of England under the jurisdiction of the Bishop of London. In 1750, Christ Church's sanctuary was finished and dedicated as a church by its rector, who was an ordained Church of England priest.[10]

In 1758, the colonial government passed a law establishing the

---

[9] The dissent says that we are relying on the "opinion" of a church historian. See, e.g., Dis. Op. at 120, 125-130. We do no such thing. What is relevant is not "church history" in general or someone's opinion about legal questions like whether a trust existed at some point in time. What matters is the specific and undisputed evidence about the governing documents of the general and local church and the parties' course of conduct in relation to those documents before the factional dispute arose – which in this case is an extended history. Notably, the dissent identifies no contrary evidence regarding these material issues. On this point and regarding the case as a whole, the dissent contends that summary judgment is inappropriate. See, e.g., id. at 160-162. However, the facts about the documents examined under the neutral principles doctrine – i.e., the material facts – are not disputed, and whether a trust on the local church property in favor of the general church is determined to exist when that doctrine is applied to those facts is a legal determination. As we explained in *Timberridge*, 290 Ga. at 286, n. 7, because the neutral principles analysis focuses on documents, summary judgment will often be proper in these cases, as it has been in most of this Court's and other courts' church property cases since *Jones v. Wolf* – which, we note, was itself a summary judgment case from Georgia. See *Jones II*, 244 Ga. at 389 (affirming, on remand from the United States Supreme Court, the trial court's judgment for the local church based on the neutral principles doctrine).

[10] The church building parcel was increased in size by colonial legislation in 1763 and 1768 and by a Savannah municipal ordinance in 1789. See *Christ Church v. Savannah*, 82 Ga. at 659.

Church of England as the official religion of the colony and dividing the Georgia colony into eight "parishes" to serve as both the civil and ecclesiastical government for their inhabitants, with Christ Church named as the first parish. The same 1758 act incorporated Christ Church and vested its property "and also all other lands, tenements, and hereditaments, as shall or may hereafter be given and granted to the said church" in the rector of Christ Church and his successors.

The American Revolution severed Christ Church's legal connection to the Church of England and its head, King George III. Georgia's first post-Independence constitution, adopted in 1777, abandoned the parish system, calling them "counties" instead of "parishes," combining some and reconfiguring others, and substituting secular names like "Chatham County" and "Liberty County" for religious appellations like "Christ Church Parish" and "Saint Paul Parish." However, Christ Church's prior status as a subordinate member of the established church aided it in retaining legal title to the church building parcel instead of having it revert to the State of Georgia after the war. See *Christ Church v. Savannah*, 82 Ga. at 662-666.

### (2) Revolution to 1823.

After the Revolution, former Church of England congregations in the United States were called "episcopal" churches. In October 1789, episcopal congregations in nine of the American states (but not Georgia) sent delegations of clergy and lay members to an assembly in New York. The delegations formed a General Convention and adopted a constitution and canons organizing the Protestant Episcopal Church in the United States of America as the successor to the Church of England for the orphaned episcopal churches in the United States. Article II of the 1789 constitution guaranteed each state in union with the Episcopal Church the right to representation at the denomination's triennial General Conventions but also provided that if a state delegation sent no representatives, "the Church in such State shall nevertheless be bound by the acts of such Convention." Article V stated that "A Protestant Episcopal Church in any of the United States, not now represented, may, at any time hereafter, be admitted, on acceding to this Constitution." Canon III required regular visits by an Episcopal Church bishop to all parishes within his geographically defined jurisdiction "for the purpose[ ] of examining the state of *his* church." (Emphasis added.)

Just two months after the Episcopal Church was organized in October 1789, the Georgia General Assembly enacted a statute incorporating Christ Church as "the Episcopal church in Savannah." The 1789 Act gave Christ Church both the ability to own property and ownership of the property it had held as a parish of the

Church of England, as one of the "new corporations of the Episcopalian denomination." *Christ Church v. Savannah*, 82 Ga. at 664.[11] Although unable at the time to affiliate formally with the Episcopal Church because Georgia did not yet have the three active episcopal churches needed to form a state diocese, Christ Church placed itself under the authority of the Episcopal Bishop of South Carolina.

In 1811, Christ Church attempted to achieve formal union with the Episcopal Church even though Georgia still lacked the three episcopal churches needed to organize a state diocese. Christ Church sent its rector, an ordained Episcopal Church priest named John Bartow, to the General Convention in Connecticut with certificates authorizing him to attend as a representative of the "Episcopal Church in the city of Savannah." The General Convention decided that Rev. Bartow could not be seated as a voting member because a Georgia diocese had not yet been organized, but it did seat him as an honorary member.

In 1790, the Episcopal Church had formulated a consecration rite for church buildings, which required the leaders of the local church to present to the bishop, in front of the congregation, "the instruments of donation and endowment" for the property. In 1815, Christ Church finished the reconstruction of its sanctuary, which had been destroyed, and invited the Episcopal Bishop of South Carolina to consecrate its new sanctuary in accordance with the Episcopal Church's rite. In 1822, Rev. Abiel Carter, another ordained Episcopal Church priest, became the rector of Christ Church.

Christ Church's efforts to organize a Georgia Diocese culminated in 1823 with the first diocesan convention.[12] Rev. Carter

---

[11] See id. at 664-665 ("We think that the [1789] grant, to new corporations of the Episcopalian denomination, of property which formerly belonged to local bodies of the established church [i.e., the Church of England], is to be regarded less as an assertion of title in the State to such property than as a recognition of continuous ownership in such local bodies, the new corporations being, as a general rule, created at church request and for church benefit."). The dissent's invocation of Justice Hugo Black's classic rendition of American history leading to the First Amendment is ironic. See Dis. Op. at 128-129 & n. 19 (quoting *Everson v. Bd. of Ed. of Ewing Township*, 330 U. S. 1, 8-16 (67 SC 504, 91 LE 711) (1947)). The church property in *this* case was not donated by citizens struggling against a "monolithic" state-established church. To the contrary, the main property at issue – the church building parcel – was given *by the government* to Christ Church precisely because the local church was part of the established general church of the time. There is no evidence suggesting that, had Christ Church been a dissenters' congregation, it would have acquired the main property that the current dissenters now claim to control. Moreover, Justice Black favorably cited *Watson v. Jones*, see *Everson*, 330 U. S. at 14 – the case that endorsed the pre-*Jones v. Wolf* approach of avoiding First Amendment entanglements in resolving property disputes in hierarchical churches by simply deferring to the decision of the general church's ecclesiastical authorities. Under that approach, the Episcopal Church would also prevail in this case.

[12] Georgia now has two Episcopal Church dioceses – the Diocese of Atlanta, which includes middle and north Georgia in addition to Atlanta, and the Diocese of Georgia, which comprises the rest of the state.

chaired the convention, and three of the five lay delegates came from Christ Church. The convention unanimously adopted a diocesan constitution, the preamble to which stated that nothing in it "shall be so construed, as to contravene any part of the Constitution or Canons, of the Protestant Episcopal Church, in the United States of America." The first article then stated:

> The several congregations of the Protestant Episcopal Church in this State, now represented in this Convention, shall be considered as one Church or Diocess [sic]; to be known and designated by the name of the "Protestant Episcopal Church in the State of Georgia," with a view to union with the Protestant Episcopal Church in the United States of America.

The convention chose seven delegates to attend the 1823 Episcopal Church General Convention and passed a resolution inviting the Bishop of South Carolina "to perform Episcopal offices in this State under the regulations prescribed by the 20th canon" of the Episcopal Church relating to provisional bishops.

At the 1823 General Convention, the Episcopal Church accepted the Georgia Diocese's accession, formally making the Georgia Diocese and its parishes, including Christ Church, components of the Episcopal Church. Accordingly, after the 1823 General Convention, the Georgia churches attending diocesan conventions referred to themselves as "parishes" instead of "congregations" and gave "parochial" reports.

### (3) 1823-1923.

Over the next century, the general church adopted additional canons that increased its formally expressed control over local church property. Christ Church not only abided by these canons but again confirmed, with a 1918 charter amendment, its accession to the constitution and canons of the Episcopal Church.

In 1839, the Georgia Diocese amended its constitution to confirm that it, "as a constituent part of the Protestant Episcopal Church of the United States of America, accedes to, recognizes, and adopts the General Constitution of that Church, and acknowledges its authority accordingly." Georgia still lacked its own bishop, however, so in 1840 Christ Church again invited the Episcopal Bishop of South Carolina to perform the consecration rite for a new sanctuary, which again involved presenting to him "the instruments of donation and endowment" for the property. In 1842, the diocese adopted a canon requiring all future Georgia parishes to adopt Articles of Association confirming that, like the original parishes, they "accede to the Constitution, Canons, doctrines, discipline and

worship of the Protestant Episcopal Church in the United States, and the Constitution and Canons of the Diocese of Georgia."

In 1868, the Episcopal Church adopted a canon expressly prohibiting parishes from encumbering or alienating consecrated property without the consent of the Bishop and diocese.[13] In the early 1870s, a dispute arose within the denomination over certain theological teachings and liturgical practices, and between 90 and 100 parishes voted to sever their ties with the Episcopal Church. However, only two of the departing congregations (one in Illinois and the other in Kentucky) attempted to retain control of the parish property, and only one succeeded.[14]

In response to these events, in 1871 the 1868 canon was revised to emphasize that consecrated properties should be "secured by the terms of the devise, or deed, or subscription by which they are given, from the danger of alienation from those who profess and practice the doctrine, discipline, and worship of the Protestant Episcopal Church in the United States of America." The Georgia Diocese also adopted a canon in 1870 that directed the Georgia Bishop to take control of the property of parishes that ceased reporting to the

---

[13] The 1868 canon provided as follows:

Sec. 1. No Church or Chapel shall be consecrated until the Bishop shall have been sufficiently certified that the building and ground on which it is erected have been fully paid for, and are free from lien or other incumbrance.

Sec. 2. It shall not be lawful for any Vestry, Trustees, or other body authorized by law of any State or Territory, to hold property for any Diocese, Parish, or Congregation, to incumber or alienate any consecrated Church or Chapel without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese in which such Church or Chapel be situated. *Provided*, that this section shall not be operative in any State with the laws of which, relating to the title and holding of property by religious corporations, the same may conflict.

Sec. 3. No consecrated Church or Chapel shall be removed, taken down, or otherwise disposed of for any "unhallowed, worldly, or common use," without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese in which said Church or Chapel may be situated.

[14] Both cases ended up in court. In the Illinois case, numerous expert witnesses from England and the United States testified about the longstanding Church of England and Episcopal Church practice of local congregations holding their property in trust for the larger church. The Illinois Supreme Court nevertheless ruled in favor of the local church. The court based its ruling on overwhelming evidence that the founders of that congregation and the donors who gave the property at issue consulted with an attorney and then deliberately structured the transaction to ensure that the property would be controlled solely by the local church with no interference from the bishop of the diocese, as well as features of the Illinois statutes on incorporation of churches not found in Georgia law. See *Calkins v. Cheney*, 92 Ill. 463, 472-477, 480 (1879 WL 8549) (1879). Kentucky's highest court ruled in favor of the Episcopal Church based on the 1868 canon, its 1871 amendment, and the local church trustees' invitation to the bishop to consecrate the church building and dedicate it for, among other things, " 'the performance of all . . . holy offices according to the order of the Protestant Episcopal Church in the United States of America,' " despite the absence in the deed of explicit trust language in favor of the Episcopal Church. *Merriweather v. Petit*, 10 Ky. Op. 113, 114 (1878 WL 7605) (Ky. 1878). Both of these decisions are consistent with ours today.

diocese if not restored to good standing.[15]

In 1904, the General Convention adopted a canon providing that the rector of a parish, "subject to . . . the Canons of the Church, . . . shall, at all times, be entitled to the use and control of the Church and Parish buildings, with the appurtenances and furniture thereof." And in 1916, the Episcopal Church adopted a canon requiring each diocese to establish a finance committee to ensure that adequate insurance was maintained on all church property, which was amended a few years later to impose even greater diocesan monitoring of parish finances.

After all these additions to the denomination's governing documents explicitly increasing the general church's control over the property of local parishes, Christ Church again formally expressed its allegiance to the Episcopal Church, the Georgia Diocese, and their rules. In 1918, Christ Church filed an amendment to its 1789 legislative charter in the Chatham County Superior Court. The amendment stated that "[t]his church does hereby acknowledge and accede to . . . the Constitution and Canons of the Protestant Episcopal Church in the United States of America, and the Constitution and Canons of the same church in the Diocese of Georgia," which included the canons discussed above. The amendment also changed "[t]he corporate name and style of this church" to "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah" and authorized the adoption of "rules or by-laws not inconsistent with the civil and ecclesiastical laws" governing the church. Christ Church amended its legislative charter again in 1923 to increase the size of its vestry, without altering its accession to the discipline of the Episcopal Church.

### (4) 1923-1981.

For the next 60 years, Christ Church continued to follow the constitution and canons of the Episcopal Church and the Georgia Diocese as they continued to increase the explicit control of the general church over the property of local churches like Christ Church, culminating in the enactment of the Dennis Canon in 1979. Far from indicating any disagreement with these canons, Christ Church repeated its accession to them in 1981, when it filed its 1789 charter, as amended in 1918 and 1923, with the Georgia Secretary of State.

---

[15] The 1870 Georgia diocesan canon provided that if, for three years, a parish failed to elect a vestry or make parochial reports, the bishop, unless he found the reasons for these failures satisfactory, was required to report the fact to the diocesan convention, and the parish's union with the diocese would cease if the parish had not been revived by the next annual diocesan convention. The canon further provided that in the event the parish was not revived, "[i]t shall be the duty of the Bishop . . . to preserve the property of such parishes for the benefit of the Church."

In 1940, the parish house parcel at 18 Abercorn Street was conveyed to Christ Church by indenture. The same year, the Episcopal Church General Convention enacted the following canon extending the requirement of diocesan approval of the encumbrance or alienation of consecrated property to *all* real property held by a parish:

> No Vestry, Trustee, or other Body authorized by civil or canon law to hold, manage, or administer real property for any parish, mission, congregation or institution, shall encumber or alienate the same or any part thereof . . . without the written consent of the Bishop and Standing Committee of the Diocese . . . of which the parish, mission, congregation or institution is a part, except under such regulations as may be prescribed by canons of the Diocese.

In 1942, the Georgia Diocese, following the General Convention's lead, adopted a canon providing that "[n]o indebtedness shall be incurred by a parish, mission, or congregation without the approval of both the Bishop and Standing Committee," subject to certain exceptions not relevant here.

In November 1947, five years after these express limitations on control of even unconsecrated parish property took effect, Christ Church took title to the first part of the school property at 134 Houston Street. In 1948, the Georgia Diocese adopted a canon requiring all prospective church wardens and vestry members to take an oath confirming their "hearty assent and approbation to the doctrine, worship, and discipline of the Protestant Episcopal Church in the United States of America." Ten years later, in September 1958, Christ Church obtained the rest of the school property. In 1978, Christ Church sought and received the consent of the Georgia Bishop and the Standing Committee before selling church property on Washington Avenue, as required by the Episcopal Church and diocesan canons.

On July 2, 1979, the United States Supreme Court decided *Jones v. Wolf*, which approved the "neutral principles" approach to resolving church schism and property disputes in a case arising out of Georgia. See 443 U. S. at 602-606. As discussed previously, in rejecting the dissent's argument that courts should continue simply to defer to the rulings of hierarchical church authorities in resolving church property disputes, the *Jones v. Wolf* Court said:

> Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. *At any time*

*before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property.* They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, *the constitution of the general church can be made to recite an express trust in favor of the denominational church.* The burden involved in taking such steps will be minimal. *And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.*

Id. at 606 (emphasis added).

Two months later, at the Episcopal Church's 1979 General Convention, the House of Bishops passed the following resolution:

> *Whereas,* the Episcopal Church is an hierarchical church, in which local parish churches are a part of, and are subject to, the Constitution and Canons of the Episcopal Church and of the Diocese in which they are geographically present; and
>
> *Whereas,* the Episcopal Church recognizes that local parishes have broad autonomy in the use of their property, so long as they act within the confines of the Constitution and Canons of the Episcopal Church and of the Diocese in which they are geographically present; therefore be it
>
> *Resolved,* the House of Deputies concurring, That Title I, Canon 6 of the Canons of the Episcopal Church, be amended to add a Section 4 as follows:
>
> Sec. 4. All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.
>
> And be it further
>
> *Resolved,* the House of Deputies concurring, That Title I, Canon 6 be amended to add a Section 5 as follows:
>
> Sec. 5. The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no action shall be necessary for the existence and validity of the trust.

The House of Bishops also passed a resolution to amend Title II, Canon 7 by adding the following new section:

> Sec. 3. Any dedicated and consecrated Church or Chapel shall be subject to the trust declared with respect to real and personal property held by any Parish, Mission, or Congregation, as set forth in Section 4 of Title I, Canon 6.

The House of Deputies approved the resolutions, which took effect immediately. These amendments are collectively known as the "Dennis Canon."

Judge Perry Brannen, Jr., of Christ Church served as a lay delegate to the 1979 General Convention. The Dennis Canon was distributed in writing to the delegates to the next annual Georgia Diocesan convention in 1980, which was attended by delegates from Christ Church. In addition, the official journal of the 1980 diocesan convention reprinted the Dennis Canon, and the journal was mailed to each parish in the Georgia Diocese, as well as the clergy of each parish and each parish's delegates to the diocesan convention.

In May 1981, 20 months after the Dennis Canon became part of the canons of the Episcopal Church, Christ Church filed Articles of Incorporation with the Georgia Secretary of the State based on its 1789 legislative charter and the amendments filed with the Chatham County Superior Court in 1918 and 1923 which stated:

> This church does hereby acknowledge and accede to the doctrine, discipline, and worship and the Constitution and Canons of the Protestant Episcopal Church in the United States of America, and the Constitution and Canons of the same church in the Diocese of Georgia.

### (5) 1981-2003.

Over the next two decades, Christ Church continued to obtain property without making any effort to avoid the general church's control and otherwise continued to function as a constituent member of the general church, complying with the constitution and canons of the Episcopal Church and the Georgia Diocese. Thus, as the canons required, in 1984 Christ Church again sought and received the permission of the Georgia Bishop before selling church property,[16] and in 1987 Christ Church asked for and received the approval of the Georgia Bishop and the Standing Committee to borrow $950,000 to

---

[16] Christ Church's letter to the Bishop stated: "In accordance with Title I, Canon 6, Section 3, the Rector, Wardens and Vestry of Christ Church do hereby apply for permission to sell the rectory at 211 East York Street for at least $160,000."

renovate the parish house property at issue in this case and to encumber the property to secure the loan.

In 1991, the Georgia Bishop consented to Christ Church's selection of Marcus B. Robertson, an ordained Episcopal Church priest, as the rector of Christ Church. Also in 1991, Christ Church's Endowment Committee reported to the vestry that the endowment fund had grown from $70,000 to $2 million in the last few years; the report expressed the committee's determination to see that this fund was "well administered not only for Christ Church, but the Diocese at large." The following year, the endowment funds were transferred to the vestry as trustees. The endowment fund agreement provided that in the event of Christ Church's dissolution, the assets were to be transferred "to another religious organization organized and operating for the similar purposes for which the said Church was organized and operating" as directed by the vestry or, if the vestry failed to act in a timely manner, as directed by "the Bishop of the Diocese of Georgia." On March 21, 1994, Christ Church obtained the two parking lot properties. During this period, Christ Church also adopted bylaws requiring election of church wardens and vestry members in accordance with the "ecclesiastical laws" of the Episcopal Church and requiring them to recite an oath assenting to the "doctrine, worship, and discipline" of the Episcopal Church.

**(6) The Dispute Erupts.**

The dispute leading to this litigation began in 2003 when the Episcopal Church General Convention approved the election of Gene Robinson as the Bishop of New Hampshire, a move opposed by the Georgia Bishop and a majority of the parishioners who contacted him about it. On November 12, 2003, the rector of Christ Church wrote to the Georgia Bishop to deny rumors that Christ Church had left the Episcopal Church, explaining that "that is not the case" and that Christ Church's vestry had adopted a "simple resolution . . . denounc[ing] the specific actions of the General Convention re: the confirmation of the episcopal election of a non-celibate gay person, and the recognition that same-sex unions are a part of our common life."

The dispute deepened in 2004 and 2005, as representatives of Christ Church continued to express concerns to the Georgia Bishop about the theological direction of the general church, as well as their desire to earmark Christ Church's financial contributions for projects within the diocese to avoid supporting the actions of the general church. Then, on March 30, 2006, without advance notice to the Bishop, the wardens and a majority of the vestry voted to amend Christ Church's Articles of Incorporation. On April 10, 2006, Articles of Amendment were filed with the Georgia Secretary of State that removed all references to the Episcopal Church and the Georgia

Diocese and stated that the 1918 and 1923 amendments to the 1789 charter were "repealed and annulled." After learning of these actions, on November 22, 2006, the Georgia Bishop filed with the trial court a declaration of the Georgia Diocese's interest in all real and tangible personal property possessed, occupied, or used by Christ Church, reciting the relevant provisions of church discipline, including the Dennis Canon.

On September 30, 2007, Christ Church's wardens and vestry adopted a resolution, later approved by a 172-24 vote of the congregation, that denounced the Episcopal Church and the Georgia Diocese as having abandoned the faith and purported to place Christ Church under the ecclesiastical authority of the Anglican Province of Uganda and the Diocese of Soroti. The Bishop then defrocked the rector of Christ Church of his Episcopal Church ordination and appointed a new priest-in-charge of Christ Church. The Bishop also removed the wardens and vestry of Christ Church for violating Episcopal Church law. On October 23, 2007, the Georgia Bishop met with the minority faction of Christ Church still loyal to the Episcopal Church to elect new church wardens and vestry members, whom the Bishop then recognized as having been chosen in accordance with the constitution and canons of the Episcopal Church and the Georgia Diocese. Rev. Michael White was subsequently called as their rector, and in 2008 and 2009, "Christ Church Episcopal" sent delegates to the Georgia Diocese's annual conventions.

### (7) Effect of Church Governing Documents.

Having reviewed the governing documents of the local church and the general church, we conclude, as did the trial court and the Court of Appeals before us, that a trust on Christ Church's property in favor of the Episcopal Church existed well before the dispute erupted that resulted in this litigation (and thus well before the 2006 corporate Articles of Amendment were filed). We need not decide whether the Episcopal Church had a trust on each parcel of real estate at issue at the moment it was obtained, nor if the neutral principles would have shown a trust on the property in 1823, 1918, 1981, or any other earlier time. Instead, we consider the record evidence of "'the intentions of the parties' at the local and national level regarding beneficial ownership of the property at issue as expressed 'before the dispute erupt(ed)' in a 'legally cognizable form.'" *Timberridge*, 290 Ga. at 277 (quoting *Jones v. Wolf*, 443 U. S. at 603, 606).

In doing so, we need not rely exclusively on the Dennis Canon. Instead, we consider the canon as one — although a strong one — of the many indications that Christ Church holds its property in trust

for its parent church.[17] In other words, like the highest courts of other states, we view the Dennis Canon as making explicit that which had always been implicit in the discipline of the Episcopal Church (and the Church of England before it), as shown in the documents setting forth, in legally cognizable and non-religious terms, the property-related rules and the relative authority of Christ Church, the Georgia Diocese, and the Episcopal Church, as well as the parties' understanding of them as revealed by their course of conduct. See, e.g., *Rector, Wardens & Vestrymen of Trinity-Saint Michael's Parish, Inc. v. Episcopal Church in Diocese of Conn.*, 620 A2d 1280, 1292 (1993) ("[T]he Dennis Canon adopted in 1979 merely codified in explicit terms a trust relationship that has been implicit in the relationship between local parishes and dioceses since the founding of [Episcopal Church] in 1789."); *Episcopal Church Cases*, 198 P3d 66, 81-81 (Cal. 2009) ("Moreover, [the Dennis Canon] is consistent with earlier-enacted canons that, although not using the word 'trust,' impose substantial limitations on the local parish's use of church property and give the higher church authorities substantial authority over that property.").

CCS and the dissent characterize this dispute as the Episcopal Church trying to take Christ Church's property. We disagree with that view of the record and the law. The First Amendment allows CCS and its members to leave the Episcopal Church and worship as they please, like all other Americans, but it does not allow them to take with them property that has for generations been accumulated and held by a constituent church of the Protestant Episcopal Church in the United States of America. Our conclusion regarding the effect of the governing documents of the local and general church in this case is consistent with United States Supreme Court precedent, this Court's prior cases, and the decisions of several other state supreme courts. See, e.g., *Barber*, 274 Ga. at 359 ("In this case, it is undis-

---

[17] We note, however, that it appears incorrect to characterize the Dennis Canon as the "unilateral imposition of a trust provision," as CCS does. The canon was enacted through the process of representative government to which Christ Church had adhered and in which Christ Church was represented. See *Christ Church v. Bishop*, 305 Ga. App. at 97-98 (noting CCS's argument that the Episcopal Church is bound by the law of New York, where it is based, and observing that the "courts in New York . . . have specifically held that the Dennis Canon 'clearly establish(es) an express trust in favor of the . . . Diocese and the National Church' " (quoting *Episcopal Diocese of Rochester v. Harnish*, 899 NE2d 920, 925 (N.Y. 2008)). Moreover, we agree with the Court of Appeals that secular courts cannot adjudicate the merits of CCS's claim that the procedures used by the Episcopal Church to adopt the Dennis Canon were flawed. See id. at 97 (recognizing that the First Amendment precludes a court from "questioning the validity of the process by which the church legislates" and noting that "other courts have routinely refused to entertain attacks on the process by which the 1979 Trust Canon was adopted"). See also *First Born Church of the Living God v. Hill*, 267 Ga. 633, 634 (481 SE2d 221) (1997) ("As a matter of constitutional law, a hierarchical religious organization must be permitted to establish the rules and regulations by which it is governed.").

puted that the [parent church] remains a hierarchy, that the [local church] has been a member of the [parent church] for over 30 years, and that the [local church] is subject to the [parent church]'s discipline. Such discipline unquestionably provides that the [parent church] 'shall hold all church property,' thereby implying a trust for the benefit of the [parent church]. And this is irrespective of the [local church's] continuing membership in the [parent church]." (citations and footnotes omitted)); *Gauss*, 28 A3d at 321 (noting that the "highest courts of several other jurisdictions also have concluded that the Dennis Canon applies to defeat claims of ownership and control over parish property by disaffected parish members, even in cases in which record title to the property has been held in the name of the parish since before enactment of the provision" (citing *Episcopal Church Cases*, 198 P3d at 79-81; *Harnish*, 899 NE2d at 924-925; and *In re Church of St. James the Less*, 888 A2d 795, 807-809 (Pa. 2005))).

CCS relies heavily on this Court's decision in the *Georgia District Council of Assemblies of God* case, where we held that the local church property was not held in trust for the general church. See 267 Ga. at 61. But there the denomination's bylaws stated that each local church " 'shall have the right to acquire and hold title to property, either through trustees or in its corporate name as a self-governing unit,' " " 'the fact that a local assembly is affiliated in the association of the District or General Council shall in no wise destroy its rights as above stated or interfere with its sovereignty,' " and " 'affiliated churches are deemed to be sovereign, autonomous, and self-determining bodies.' " Id. at 61, n. 2. Here, the "bylaws" of the Episcopal Church state exactly the opposite, and, along with the other neutral principles, lead to the opposite result. The juxtaposition of the two cases also illustrates that, despite the dissent's lament, the result of neutral principles analysis by this Court is not pre-ordained but instead depends on the title instruments, applicable statutes, and general and local church governing documents at issue in the particular case. Finally, the South Carolina decision on which CCS relies is readily distinguishable, and it has not been followed in a church property case by any court outside that state.[18]

2. As in *Timberridge*, 290 Ga. at 287, the resolution of this

---

[18] See *Gauss*, 28 A3d at 326 (explaining that in *All Saints Parish Waccamaw v. Protestant Episcopal Church in Diocese of South Carolina*, 685 SE2d 163 (2009), the South Carolina Supreme Court determined that the disputed property was owned by the local church but "specifically relied on South Carolina statutory and common law, including the law on trusts, relating to the formal conveyance of title, and thus gave no weight to the Dennis Canon" and "did not examine documents signed by congregation members when they were seeking to become a parish, which might have indicated whether parish members had agreed to abide by the constitution and canons of the Episcopal Church"). Notably, the dissent cites no other case

church property dispute in the general church's favor does not rest on the "mere connectional relationship between a local and general church." *Carnes*, 236 Ga. at 35. Instead, our decision derives from the specific provisions of the governing documents adopted by the local and national churches, supported by the policy reflected in OCGA §§ 14-5-46 and 14-5-47 and not contradicted by the title instruments at issue. Our decision is based on the sort of legal materials that are "familiar to lawyers and judges" and embodied in "legally cognizable form," and it has nothing to do with the religious doctrine of the denomination or the local congregation. *Jones v. Wolf*, 443 U. S. at 603, 606.

In the end, it is fair to say, as the trial court did, that Christ Church

> can no more shrug off the trust, than the National Church could unilaterally impose it. The trust has historical roots going back to the English church and the founding of the Episcopal church in this country. Christ Church got the benefit of its bargain with the National Church for many years. The National Church has the right to insist on its part of the bargain as well.

Like the trial court and the Court of Appeals, we conclude that neutral principles of law demonstrate that an implied trust in favor of the Episcopal Church exists on the property of Christ Church. See *Timberridge*, 290 Ga. at 288; *Barber*, 274 Ga. at 359; *Crumbley*, 243 Ga. at 345.

*Judgment affirmed. Hunstein, C. J., Benham, Thompson, Hines and Melton, JJ., concur. Judge S. Phillip Brown dissents. Carley, P. J., not participating.*

BROWN, Judge, dissenting.

**I. *Introduction***

I respectfully dissent. Today's majority opinion misinterprets neutral principles of law as set forth by the United States Supreme Court in *Jones v. Wolf*, 443 U. S. 595 (99 SC 3020, 61 LE2d 775) (1979). The majority also reaches an unjust result that is contrary to law in many ways. The *Jones* Court envisioned neutral principles as a practical solution to solve hierarchical church property disputes. Neutral principles analysis allows for quick and informal resolution of these sorts of disputes without expensive and time-consuming

---

involving an Episcopal Church property dispute that supports its conclusion. See Dis. Op. at 165.

litigation. In my view, this four-year multi-million dollar lawsuit would not be necessary if the basic precepts of *Jones* had been utilized.

As an aside, lawyers always have examined neutral principles: deeds, state statutes, corporate charters, and organizational constitutions, in analyzing title. This is traditional title "lawyering" with the addition that, for church property, the examination of said documents must be religion neutral. Surely John Adams and Abraham Lincoln examined deeds and state statutes to determine if their clients had clear title in property.

*Jones* offered a tool for the analysis of whether or not there was a trust. It provided for a quick and easy review of certain essential documents (neutral principles) that would establish whether a trust was intended to be created by the parties and if so, in favor of which party. According to the United States Supreme Court, local lawyers and judges are experts in the analysis of such neutral principles, which include deeds, state statutes, local church charters, and general church constitutions. These four neutral principles, and only these four neutral principles, would reveal a trust readily if one existed. If these documents revealed no trust, that was designed by *Jones* to be the end of the inquiry, unless the parties desired to change their neutral principles, which is allowed under *Jones*. Changing deeds or trust agreements could not be done unilaterally, but if these documents could be lawfully changed, the *Jones* Court permitted doing so.

If the parties desired a different result than the result obtained by this quick analysis of their neutral principles, *Jones* said that the parties are able to modify these documents to ensure their desired result with minimal costs and effort. The modified documents will settle the dispute provided these changes are made *before the dispute arises*. That the changes have to be made before the dispute arose is an important point because it builds on the notions of fair play and ensures that the rules do not change after the dispute began.

Both fair play and due process mandate that parties know the rules they are playing by before a case begins. Once the game starts, it is too late to change the rules of the game that determine who wins. As applied in this case, the parties must win or lose based on the facts established by the neutral principles already in existence when the dispute arose. Neither *Jones* nor due process of law would allow for the judicial creation of a new type of implied trust four years after this litigation started and the use of that new rule to take CCS's property, which CCS has owned since 1733, assuming that the land grants from the Church of England and the colonial government were, in fact, deeds. This is especially true here since this new variation of an implied trust is antagonistic to Georgia's implied

trust statutes. See, e.g., OCGA §§ 53-12-130 and 53-12-132.

Upon determining that none of the neutral principles defined by *Jones* established a trust on CCS's property for the benefit of the National Church, the analysis should have stopped because the presumptive rule of majority representation has not been overcome by any neutral principles. Stated slightly differently, *Jones* mandates that any neutral principles proffered by the minority faction in a church property dispute must defeat the presumption that the majority faction wins. However, contrary to today's majority opinion, *Jones* does not mandate that the majority faction or CCS must affirmatively disprove the National Church's claimed interest on its property based on any number of non-neutral principles. Rather, the burden of proof remains squarely on the minority faction or intervening plaintiff CCE to use the specifically enumerated neutral principles in order to defeat the presumptive rule of majority representation, under which CCS wins. Instead of limiting its inquiry to neutral principles, the majority opinion investigates a variety of non-neutral principles, such as, church history. History is necessarily subjective, and church history is not religion neutral. This is not a proper basis for investigating whether the parties intended to form a trust on the property based on what the deeds expressed. Deeds speak for themselves and cannot be properly understood as adding terms to refer to subjective church history compiled by a church historian many years after CCS first obtained its deeds. The majority also consulted prior case law to determine if a trust exists, but the case law consulted differs from the applicable state statutes. Based on these irrelevant items, the majority created an entirely new type of implied trust, in violation of Georgia law. The enormous time and expense spent on this case would not have occurred under the neutral principles approach set forth in *Jones* since the parties could have spent a couple thousand dollars at most to examine the deeds of the local church, the applicable state statutes, the local church's corporate charter, and the national church's constitution. Based on their review of the neutral principles specified in *Jones*, the parties easily would have seen that these documents did not provide for any trust in favor of the National Church. Once the National Church and intervening plaintiff CCE realized that they could not overcome the presumption of majority rule in favor of CCS described by the United States Supreme Court in *Jones* and selected by the Supreme Court of Georgia in *Jones v. Wolf*, 244 Ga. 388 (260 SE2d 84) (1979) (on remand), this church property dispute should have been immediately and definitively resolved in favor of CCS, as the majority faction.

The National Church's realization that under *Jones*, CCS won this church property dispute is the sole explanation for why the

National Church undertook a title analysis based on non-neutral principles. It decided to rely on irrelevant church history and then tried to establish a trust without having any deeds that evidence the parties' intention to create a trust. The National Church's skewed view of church history has no relevance whatsoever to what CCS (as the grantee) and the Crown, the State of Georgia, and others (as the grantors) actually intended at the time that various grantors conveyed the property to CCS. Under *Jones*, the relevant issue is whether either the original grantee or the original grantor intended to create a trust, and because the National Church is neither the original grantee nor the original grantor, its understandings and intentions allegedly expressed through its own self-serving view of church history is irrelevant to the proper resolution of this case.

Nevertheless, soon after the United States Supreme Court decided *Jones*, the National Church put the Dennis Canon on its agenda for passage at the 1979 General Convention. The Dennis Canon, according to the National Church, creates a trust although the Dennis Canon utilized no deeds to do so and is inconsistent with Georgia laws in many ways since it allows the National Church to create a trust without owning the trust property and without any deed to CCS's property; without any writing satisfying the statute of frauds as applied to trusts; no expressed intent of CCS to transfer its property; no description of property; and in clear violation its duties to fully communicate with CCS and to treat CCS with the utmost good faith.

Today's majority opinion effectively eviscerates many of Georgia's property laws, trust laws, and equity laws, including the laws establishing rights and duties between confidential relation or those with special relationships to one another. Examples of confidential relationships include: doctor-patient, husband-wife, priest-parishioner, teacher-pupil, guardian-ward, trustee-beneficiary, and lawyer-client. The special relationship between the National Church and CCS should prevent the National Church from trying to create a trust for the National Church's benefit on CCS's property.

By destroying the dependability of Georgia's property, trust, and equity laws, we also destroy the economic incentives to succeed economically in order to acquire property. Why acquire property if one's property can be taken without permission by one's parent church or anybody else? Take that incentive to succeed and the right to own property from us and we have taken the economy down the same trajectory we take the legal protection of our property.

Even the language of the two state statutes that the majority claims to have followed, OCGA §§ 14-5-46 and 14-5-47, are used only after the statutory language is changed by filtering these statutes through prior cases that all parties agree misinterpreted these

statutes to say what they do not say. OCGA § 14-5-46 is filtered through *Carnes v. Smith*, 236 Ga. 30 (222 SE2d 322) (1976) so as to incorporate church organization and discipline in order to determine a trust. This allows the majority to bring in the Dennis Canon, which is claimed to be determinative of Georgia property and trust law regarding churches. The only problem with this approach is that all parties agree that the plain language of the statute does not allow for referencing church organization and discipline (the Dennis Canon). Similarly, OCGA § 14-5-47 by its clear terms applies only to deeds to a trustee. Since trustees are not involved in the deeds to CCS, OCGA § 14-5-47 does not apply to these facts.

For all of these reasons, I vigorously dissent from the result reached by today's majority opinion and the flawed reasoning underlying that result.

### II. *Jones v. Wolf*

In *Jones v. Wolf*, 443 U. S. 595, the United States Supreme Court addressed a church property dispute involving the Vineville Presbyterian Church of Macon, Georgia. This is notable because *Jones* dealt with Georgia law, and with its decision, *Jones* gave Georgia and other states the right to choose whether to use one of several possible approaches to resolving church property disputes between local churches and parent churches. One constitutionally permissible approach when adjudicating church property disputes was the neutral principles of law approach, which involved no consideration of doctrinal matters. *Jones*, 443 U. S. at 602. After upholding the constitutionality of the neutral principles approach, the United States Supreme Court sent this case back to the Supreme Court of Georgia to choose what method Georgia would use in resolving church property disputes. Id. at 609-610.

The goal was to allow the church to examine certain documents called "neutral principles of law," including "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property" before the dispute arose in order to ensure that the dispute would be resolved "in accord with the desires of the members." *Jones*, 443 U. S. at 603-604.

On remand, the Supreme Court of Georgia adopted a "presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means." *Jones*, 244 Ga. at 388 (2), quoting *Jones*, 443 U. S. at 607. The Supreme Court of Georgia further held that the "presumption [of majority rule] is overcome under Georgia law by an application of what has come to be known as 'neutral principles' of law that is, 'state statutes, corporate charters, relevant deeds, and the organiza-

tional constitutions of the denomination.' " *Jones*, 244 Ga. at 388 (2), quoting *Crumbley v. Solomon*, 243 Ga. 343, 343 (254 SE2d 330) (1979). As applied in this case, CCS, as the majority faction, is the presumptive winner of this church property dispute unless the neutral principles say otherwise, which they do not as discussed infra.

The practical idea behind the neutral principles approach was that churches, whether local or national, could review applicable state statutes, relevant deeds, corporate charters, and provisions in the church constitution and decide before a dispute arose whether the majority faction controlled the church property or not. If a local church such as CCS looked at its documents and decided it would win a legal contest with the National Church, then CCS would have no need to take any action. It could rest on the result forecast by neutral principles, as interpreted by local lawyers, knowledgeable about interpreting deeds, state statutes, corporate charters, and national church constitutions, who advised the local church who would win. If the forecast after reviewing said neutral principles indicated that the local church or the national church would lose a church property dispute, *Jones* set out the possible remedies. The forecasted losing party could take steps that would allow them to prevail, assuming that the losing party could obtain the cooperation of other interested parties. According to *Jones*, the forecasted losing party could "modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church." *Jones*, 443 U. S. at 606. "Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church." Id. In this case, the National Church did not attempt to recite an express trust in the general church constitution, but it instead chose to enact the Dennis Canon, a mere bylaw. Why? Did the National Church realize that it could not pass a constitutional amendment or convince CCS to modify its local corporate charter but that it could enact a bylaw, such as, the Dennis Canon? Regardless, the fact is that the National Church did not adopt any of the possible remedies identified in *Jones*. Because the National Church failed to modify the neutral principles, there is nothing in those neutral principles to overcome the presumption that CCS, as the undisputed majority faction, retains control over its property.

### III. *The Majority's Flawed Application of Neutral Principles and Jones v. Wolf*

The majority opinion describes neutral principles of law as including, "deeds and other instruments of title, state statutes, and *documents regarding local and general church government.*" Maj. Op. at 97 (emphasis added). The majority's description is antagonistic to the United States Supreme Court's description of neutral

principles in *Jones*, which specifically listed only the following four neutral principles of law: "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." *Jones*, 443 U. S. at 603. Unlike the United States Supreme Court in *Jones*, today's majority opinion adds all documents regarding local and general church government to its list of neutral principles. See Maj. Op. at 97. In so doing, the majority makes a critical and unwarranted departure from the specifically enumerated neutral principles described in *Jones* by expanding its list of neutral principles to include mere bylaws, church history, and prior case law. Further, the Dennis Canon, by its terms, is not the same as a legally recognized trust under Georgia law for reasons set out infra. Even if the Dennis Canon could be characterized as a legally recognizable trust under Georgia law, CCS nevertheless would maintain perfect title under Georgia's adverse possession statute, OCGA § 44-5-164.

In addition to describing neutral principles antagonistically to the United States Supreme Court in *Jones*, the majority opinion also applies its so-called neutral principles in a manner that diverges widely from the United States Supreme Court's intended application. After summarily discounting the value of examining deeds and other instruments of title as neutral principles here, the majority proceeds to misapply three state statutes, each one a neutral principle under *Jones*, namely — OCGA §§ 14-5-46, 14-5-47, and 53-12-20.

The majority opinion proceeds to devote the bulk of its analysis not to the terms of deeds, state statutes, local church charters, or the constitutional provisions of the general church, as *Jones* commanded, but rather to the amorphously termed church government documents. See Maj. Op. at 103-118. That is, after deriding the ongoing relevance of both deeds and state statutes, two of the four neutral principles expressly listed by the United States Supreme Court in *Jones*, 443 U. S. at 603 and the Supreme Court of Georgia in *Jones*, 244 Ga. at 388 (2), the majority asserts that

> [i]t is most revealing (although unfortunately not most succinct) to review the local and general church documents as they were created, amended, and followed over the course of the quarter millennium that Christ Church interacted with a parent denomination before the dispute underlying this lawsuit arose.

Maj. Op. at 104. The historical documents the majority then injects contain no deeds, no state statutes, and no local church charters, as

*Jones* commands. I ask rhetorically whether this historical narration is a neutral principle under *Jones*, and if not, why examine it at all?

The lengthy historical narration included in the majority's discussion of local and national church governing documents is also troubling because church history, while informative regarding the development of various church documents, is not a recognized neutral principle. Further, the history of CCS and the National Church is a highly complicated and inherently subjective topic that does not lend itself to the straightforward neutral principle approach envisioned by *Jones*.

Unlike deeds, state statutes, corporate charters, and general church constitutions, the lengthy historical narration or affidavit prepared by the church historian in this case did not exist before the dispute arose. Rather, this affidavit was prepared only after the National Church hired the church historian to prepare an expert opinion for purposes of this litigation. Therefore, under *Jones*, this lengthy historical narration or affidavit cannot be used as a neutral principle or otherwise. Moreover, because this affidavit consists almost entirely of hearsay or opinions based on the hearsay of others, it is questionable whether the conclusions of this hired history would be admissible in any court of this state or elsewhere. The church historian's affidavit is also inextricably engaged with the theology of the National Episcopal Church since, as it clearly states, church property was considered sacred, and had special rules for its care and certain religious rules regarding its becoming and remaining sacred, such as, consecration.

The majority opinion has made no effort to read this history and cull out of all consideration the subject property as it relates to the National Church's theology. As a result, the majority's reliance on historical narration within its discussion of local and national church documents is fraught with the danger of overstepping the clear boundaries of the First Amendment, which requires that this Court engage in absolutely "no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones*, 443 U. S. at 602 (punctuation omitted).

Of significant importance is that this church history does not set out the opinion of any particular historical person who claimed that there was an "understanding" of any trust. Nor does any identified person say what they mean by an understanding of a trust, nor who understood it to be a trust; nor the training of such person to know whether a trust existed under the law; nor how such a trust came to be; nor what political venue recognized this understanding of a trust. This dearth of historical information goes to the heart of this case. The majority opinion holds that Georgia law of property and trust is inferior to the National Church's nebulous historical recollections

and proffered opinions lacking factual support. If the National Church understood there was a trust here, then that is all this majority opinion requires for this Court to find a trust despite Georgia laws to the contrary. Why isn't CCS, who owned the property, entitled to present evidence about its historical understanding of any trust? Contrary to the majority, I contend that the Georgia laws governing trusts and property transfers, which are neutral principles under *Jones*, rather than the professed historical understandings of the National Church's hired expert witness, which are not neutral principles under *Jones*, are most relevant to resolving whether there is an actual legal trust in this case.

In Georgia, one confidential relation must take care to communicate openly and to operate with the utmost good faith toward the other confidential relation. OCGA §§ 23-2-53; 23-2-58. It is not rightly a private matter between two churches in a power relationship that one exercised undue control over the other. The public has a vested interest in Georgia property and trust law remaining valid. Should we utilize the applicable Georgia statutes as opposed to relying on which party offered a more compelling story about unidentified others' historical understandings, we would require that the parties abide by the safeguards of Georgia law before finding any such trust.

The history of the National Episcopal Church, if the hired history proffered by the National Church were complete, would show monolithic churches, including the Anglican Church, were once so powerful that all citizens feared them. Many early settlers to this land came here out of fear of the cruelty of these monolithic churches, made cruel because they had their tentacles in state power. This history shows abuses not only of local churches, but abuses of local church members. It tortured them. It exacted taxes to support its ministers and buildings that the tortured members did not want or need. Members were forced to go to church. On occasion members were killed for disobedience.

I include the stirring historical synopsis written by Justice Hugo Black in *Everson v. Bd. of Ed. of Ewing Township*, 330 U. S. 1, 8-16 (67 SC 504, 91 LE 711) (1947), for those interested in a more complete history of churches as it relates to the enactment of the First Amendment in the United States.[19] This history was conveniently

---

[19] In *Everson*, 330 U. S. at 8-16, Justice Hugo Black beautifully summarized the troubling history surrounding the enactment of the First Amendment in the United States in the following passage:

A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches. The centuries immediately before and contemporaneous with the

## omitted from the affidavit tendered by the National Church's expert

colonization of America had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy. With the power of government supporting them, at various times and places, Catholics had persecuted Protestants, Protestants had persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted Catholics of another shade of belief, and all of these had from time to time persecuted Jews. In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, nonattendance at those churches, expressions of non-belief in their doctrines, and failure to pay taxes and tithes to support them.

These practices of the old world were transplanted to and began to thrive in the soil of the new America. The very charters granted by the English Crown to the individuals and companies designated to make the laws which would control the destinies of the colonials authorized these individuals and companies to erect religious establishments which all, whether believers or non-believers, would be required to support and attend. An exercise of this authority was accompanied by a repetition of many of the old world practices and persecutions. Catholics found themselves hounded and proscribed because of their faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects; men and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated. And all of these dissenters were compelled to pay tithes and taxes to support government-sponsored churches whose ministers preached inflammatory sermons designed to strengthen and consolidate the established faith by generating a burning hatred against dissenters.

These practices became so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence. The imposition of taxes to pay ministers' salaries and to build and maintain churches and church property aroused their indignation. It was these feelings which found expression in the First Amendment. No one locality and no one group throughout the Colonies can rightly be given entire credit for having aroused the sentiment that culminated in adoption of the Bill of Rights' provisions embracing religious liberty. But Virginia, where the established church had achieved a dominant influence in political affairs and where many excesses attracted wide public attention, provided a great stimulus and able leadership for the movement. The people there, as elsewhere, reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group.

The movement toward this end reached its dramatic climax in Virginia in 1785-86 when the Virginia legislative body was about to renew Virginia's tax levy for the support of the established church. Thomas Jefferson and James Madison led the fight against this tax. Madison wrote his great Memorial and Remonstrance against the law. In it, he eloquently argued that a true religion did not need the support of law; that no person, either believer or non-believer, should be taxed to support a religious institution of any kind; that the best interest of a society required that the minds of men always be wholly free; and that cruel persecutions were the inevitable result of government-established religions. Madison's Remonstrance received strong support throughout Virginia, and the Assembly postponed consideration of the proposed tax measure until its next session. When the proposal came up for consideration at that session, it not only died in committee, but the Assembly enacted the famous "Virginia Bill for Religious Liberty" originally written by Thomas Jefferson. The preamble to that Bill stated among other things that

"Almighty God hath created the mind free; that all attempts to influence

witness. As Justice Black explains in *Everson*, this abuse of power by

it by temporal punishments, or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the Holy author of our religion who being Lord both of body and mind, yet chose not to propagate it by coercions on either . . .; that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; that even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern. . . ."

And the statute itself enacted

"That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened, in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief. . . ."

This Court has previously recognized that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute. *Reynolds v. United States*, [98 U. S. 145, 164 (25 LE 244) (1878)]; *Watson v. Jones*, [80 U. S. (13 Wall.) 679 (20 LE 666) (1872)]; *Davis v. Beason*, 133 U. S. 333, 342 [(10 SC 299, 300, 33 LE 637)] (1890). Prior to the adoption of the Fourteenth Amendment, the First Amendment did not apply as a restraint against the states. Most of them did soon provide similar constitutional protections for religious liberty. But some states persisted for about half a century in imposing restraints upon the free exercise of religion and in discriminating against particular religious groups. In recent years, so far as the provision against the establishment of a religion is concerned, the question has most frequently arisen in connection with proposed state aid to church schools and efforts to carry on religious teachings in the public schools in accordance with the tenets of a particular sect. Some churches have either sought or accepted state financial support for their schools. Here again the efforts to obtain state aid or acceptance of it have not been limited to any one particular faith. The state courts, in the main, have remained faithful to the language of their own constitutional provisions designed to protect religious freedom and to separate religions and governments. Their decisions, however, show the difficulty in drawing the line between tax legislation which provides funds for the welfare of the general public and that which is designed to support institutions which teach religion.

The meaning and scope of the First Amendment, preventing establishment of religion or prohibiting the free exercise thereof, in the light of its history and the evils it was designed forever to suppress, have been several times elaborated by the decisions of this Court prior to the application of the First Amendment to the states by the Fourteenth. The broad meaning given the Amendment by these earlier cases has been accepted by this Court in its decisions concerning an individual's religious freedom rendered since the Fourteenth Amendment was interpreted to make the prohibitions of the First applicable to state action abridging religious freedom. There is every reason to give the same application and broad interpretation to the "establishment of religion" clause. The interrelation of these complementary clauses was well summarized in a statement of the Court of Appeals of South Carolina, quoted with approval by this Court, in *Watson v. Jones*, [80 U. S. (13 Wall.) 679, 730]: "The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasions of the civil authority."

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person

monolithic churches who obtained their power to abuse and punish was power given to the church by the state in cases like this, by good hearted judges who did not intend any harm, but whose fear of the National Church or deference to its power structure instead of the law, created a monster church from which many of the early settlers of this country fled Europe. These settlers refused to pass the United States Constitution until there was assurance in our First Amendment that we would be free from churches' abuse and power that derived from the state transferring power to the churches. Yet, in this case, the majority opinion gives unbelievable preferential legal treatment to the National Church and uses as one reason to do so its survey of church history. Included within this same period in church history, but ignored by the majority opinion, is that some of our earliest settlers fled from England trembling with fear of monolithic churches. Justice Black's stirring language in *Everson* belies the majority's reliance on church history to rule in favor of the National Church.

A review of the majority's discussion about "local and national church documents" reveals that rather than restricting its focus to the remaining two neutral principles of law identified in *Jones*, 443 U. S. at 603 (local church charters and the constitution of the general church), the majority instead engages in a sprawling historical narration that extends from 1733 and the founding of Christ Church to 2009 or six years after the dispute leading to this litigation erupted. The affidavit of the National Church's hired expert witness traces back even further in church history to the period in which settlers fled from Europe to America to escape the clutches of church terror.

The majority rationalizes its irregular description and application of neutral principles by claiming that "[o]ur ultimate goal is to determine the intentions of the parties at the local and national level regarding beneficial ownership of the property at issue as expressed before the dispute erupt[ed] in a legally cognizable form." Maj. Op. at 97 (citations and punctuation omitted). Yet, the United States Supreme Court never stated in *Jones* that the "intentions of the parties" is a neutral principle of law. Rather, the *Jones* Court

---

can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State." *Reynolds v. United States*, supra[, 98 U. S. at 164].

assumed that such intentions would be evident from examination of the neutral principles. See *Jones,* 443 U. S. at 603. Therefore, only the specifically recognized neutral principles can be used to explain the parties' intentions, rather than hearsay and unfounded historical rumor by those who have not been shown to know what a trust is as a matter of law.

Church history was not even listed in *Jones* as being relevant to determining whether a trust exists because it is wholly irrelevant. History may help explain the law, but history does not create law. The Legislature creates the law, or the parties create a trust by the documents and in accordance with the law. Enacting laws is the function of the Legislature. Enacting law is not the function of this Court, and is certainly not the function of a church historian hired as an expert witness by the National Church. This is why *Jones* commands that we look to deeds, state statutes, local church charters, and general church constitutional provisions, rather than to each party's skewed version of church history to determine whether a trust exists.

Of course, the "intention of the parties" may be reflected in the specific language of deeds, relevant state statutes, corporate charters, or the organizational constitutions of the denomination. Yet, it is the duty of this Court to carefully examine each of the neutral principles identified by the United States Supreme Court in *Jones* in "purely secular terms" in order to determine whether any of these documents "indicates that the parties have intended to create a trust." *Jones,* 443 U. S. at 604. Under *Jones,* the neutral principles either express the parties' intention to create a trust or not. By contrast, under the majority opinion, the parties' supposed intentions based on their historical understandings, regardless of what the neutral principles establish, create a trust. This is not in accordance with *Jones.*

Simply stated, it is the unambiguous language in the neutral principles that must reveal any intention of the parties to create a trust on church property, and not the complicated and subjective topic of church history. This use of certain specific foundational documents in order to determine title is in accord with the property law of every state that I have encountered.

Today's majority opinion excuses the National Church from complying with the requirement of filing any title documents or of changing corporate charters or church constitutional provisions as *Jones* described by this Court's declaration that following the law would be too expensive and burdensome for the National Church. What justification exists for a failure to require the National Church to file written deeds before it obtained title or a failure to require deeds be signed and recorded? Why fail to uphold longstanding

Georgia trust law and create a new type of implied trust antagonistic to the existing law, then apply this new type of implied trust retroactively so as to allow the National Church to prevail?

### IV. *The Intention of the Parties*

Basic questions about the National Church's conduct as evidencing its intentions in this case include, but are not limited to, the following pertinent inquiries, all of which should be resolved by a jury: Did the National Church act as if it intended that any trust for the benefit of the National Church be established on the local church's property when it failed to ever notify the local church that it claimed a trust interest since its inception? Do the National Church's actions evidence its intent that there be a trust for its benefit on CCS's property? Did the National Church's conduct reveal any intention to unilaterally change the dictionary definition of the term "canon" to its own private definition of a "trust" when it asked agents of CCS to sign administrative forms prepared by the National Church in order to be able to claim that CCS's agent ratified or acceded to a trust on CCS's property? Why use such tactics to create a trust if the National Church claims it already had a trust? Did the National Church provide a new definition of the term "canon" to mean something entirely different than what various dictionaries say it means, that is, "church dogma"? Alternatively, did the National Church privately intend by its use of the term "canon," to create a trust on CCS's property? Why did it do so if the National Church claimed it already had a trust? Did the National Church ever warn CCS that by signing an administrative form acceding to a "canon," that the National Church actually intended for CCS to accede to a trust? Or was the National Church actually asking CCS to agree to a trust whereby the National Church would become the beneficiary of all of CCS's property and money without ever sharing its secret intention with CCS? Did the National Church ever display its intention to deny to the local church its legal rights under church documents to participate in the process of self-governance concerning the real property interests of the local church? Does such conduct evidence that the National Church recognized that it had no trust interest under *Jones* and so it needed to set out and get one by sleight of hand many years later? By what right should the National Church be permitted to keep a dossier of CCS's conduct from 1918 to when the dispute erupted without ever mentioning it to CCS, only to surprise CCS with this dossier years later?

After carefully reviewing the facts of this case, I submit that the troubling conduct displayed by the National Church toward CCS can support only one conclusion, namely that the National Church did not claim any trust interest on CCS's property, and the National Church's claims to the contrary now are, at best, disingenuous. The

National Church never openly communicated to CCS its intention to claim a trust interest on CCS's property. In defense of the National Church, it is likely that the National Church would justify its tactics as being in accordance with its theology, which views church property as sacred. Although the theology of the National Church may help explain its conduct, it does not justify the National Church's troubling efforts to take CCS's property through what appears to be deceptive means despite having no legally recognizable interest in that property. Insofar as the majority disagrees, a jury should be permitted to resolve these factual issues.

One illustration of the National Church's allegedly troubling conduct relates to the period surrounding the enactment of the Dennis Canon. CCS claims that after the National Church decided to place the Dennis Canon on the agenda for the 1979 General Convention, the National Church made the deliberate decision to exclude CCS from being notified about the planned consideration of the Dennis Canon at the 1979 General Convention. As a result, CCS alleges that it did not know that the Dennis Canon was on the agenda at the 1979 General Convention and did not attend the 1979 General Convention. According to CCS, this deprived CCS of its right to vote against the Dennis Canon and its right to use its political influence and lobby other local churches to do the same. CCS also alleges that the National Church deprived CCS from knowing about the enactment of the Dennis Canon for approximately 20 years thereafter.

Assuming that CCS's allegations are credible, CCS could have argued against the Dennis Canon and urged other local churches to vote against the Dennis Canon, if CCS were informed of the scheduled vote prior to the 1979 General Convention, for all of the reasons set forth in this dissent. Enacting the Dennis Canon was contrary to the laws of this state and presumably contrary to the laws of other states. If enacted and interpreted as the National Church does the Dennis Canon dangerously allows for one legal entity (the National Church) to create a trust on the property of others (CCS), for the benefit of the stranger to title (the National Church). This fact alone would have been a selling point that CCS could have used to get other local churches to vote against the Dennis Canon — if CCS had been invited to attend, as it had a right to be, and as the National Church deceitfully engineered it that CCS would not attend. Contrary to the majority opinion, there is no evidence that Judge Brannen — the lay leader that allegedly attended the 1979 General Convention — attended as an official representative of CCS or ever reported back to CCS that the National Church had created a trust on CCS's property. Indeed, CCS alleges that Judge Brannen did not attend the 1979 General Con-

vention as its representative, but rather he attended as a representative of the diocese. Any failure of Judge Brannen to report this information back to CCS tends to establish that he did not attend as CCS's official representative and that the National Church did not intend to create a trust through the Dennis Canon.

Another illustration of the National Church's allegedly troubling conduct that a jury could find relevant with regard to the National Church's intention is when CCS asked for and received the approval of the National Church regarding a loan in the amount of $950,000 to renovate a church building. The local church's real estate was and is collateral for that loan. Though the National Church gave its approval for the loan, the National Church never informed either CCS or the lender that the National Church claimed a trust interest for its own benefit on the subject property. If the lender had known that the National Church claimed a trust for its own benefit on this property, good banking practice would be for the lender to protect itself should the National Church ever foreclose the note surrounding the property. Keep in mind that the majority opinion excuses the National Church from utilizing a deed or other writing to transfer property to a trust and excuses the National Church from having to record any deed of trust in the appropriate records in order for all others (including the lender) to be on notice of the National Church's claimed trust interest in the property. As a result, the lender had no notice of the National Church's claimed trust interest when it took an interest in this property as security for the loan thinking that it took clear title to the property, only to find out that it was the National Church's property, even though the National Church had not obligated itself to pay the note. Nor did the lender know that today this Court would waive the requirement of a deed of trust being recorded and filed. Did the lender rely on the very law requiring the recording of a deed to create a trust, only to learn today that this statutory law was negated by the majority's judicial decree? Certainly, both the lender and CCS are harmed by the majority's decision. It appears that this Court is leaving the lender unprotected along with everyone else so as to grant privileges to the National Church from not having to obtain or record any deed in order to claim a trust interest.

The loss of this church property certainly will impact the personal guarantees of CCS's members on this $950,000 note as well as the bank. Yet, the lender was not given any of this critical information concerning the National Church's claim of being the beneficiary of a trust interest on this property when the renovation loan was made so as to protect itself against this or other contingencies. If the National Church had been more forthcoming about its claim of a trust with either CCS or the lender, perhaps CCS would

not have borrowed $950,000 to renovate property. I am beginning to see that either the National Church is blatantly and unabashedly deceitful to everybody including the lender whose loan it approved, or else (and this is for a jury) the National Church did not advise anyone of its claimed trust interest because it knew full well that under existing Georgia law it had no trust. The evidence of the National Church's intention regarding its claimed trust interest in the subject property needs to be interpreted by a jury. That is not a finding that this Court can make. Only a jury after reviewing all of the facts in evidence can make a determination about the parties' intentions regarding a trust.

If the National Church intended no trust then certainly there is no trust. We already know that CCS did not intend any trust and never gave a valid deed, nor signed or had witnessed any document that would satisfy the requirements of a trust deed. Failure to advise the bank of a trust also should work to preclude the National Church from claiming a trust against CCS. If CCS had been informed by the National Church of its claimed trust, CCS could have and likely would have refused to guarantee the note to the bank to improve the National Church's property, leaving itself to pay that million dollar note after the National Church kicked CCS out. This represents another example of the National Church's questionable conduct by failing to be openly and fully communicative with it confidential relation CCS as required by various state statutes. Additionally, this represents another example of the privileges granted to the National Church against having to follow the law. This is nearly a $2,000,000 ($950,000 x 2 = $1,900,000) privilege to the National Church. This gift is in addition to the several million dollars of property value in the National Church's claimed trust. This harms CCS an additional $950,000 by its members having to pay the loan, yet lose the property.

For the National Church to approve the bank taking this property as collateral and at the same time not tell the bank of its claimed trust interest arguably evidences the National Church's attempt to be deceitful with the bank. In the alternative, the National Church's conduct evidences that the National Church did not claim any trust interest. Plainly, the National Church knew about this loan since it had to sign off on it. However, the National Church's complete failure to let the bank or CCS know about its claimed trust endangered the bank's security interest in the property and disrupted CCS's right of use and enjoyment of the property. If CCS left the National Church, then the bank would have new owners of the property (the National Church) with no local owners who had an interest in the upkeep of the condition of the property and no interest in seeing that the note was paid. This impacted the

lender's security interest as it impacted CCS's title. This Court cannot read the bank's mind as to what it would have done had the National Church been as honest and forthcoming with the bank as it should have been. The bank can speak for itself in this regard during a jury trial, but only if this Court permits it to do so. But it certainly seems that the bank in loaning $950,000 to CCS had a right to honest treatment and fair dealing from the National Church, which purports to hold a trust for its own benefit in the property used as collateral for the loan.

Since this Court has held that the intentions of the parties are paramount, these examples of specific troubling conduct by the National Church that evidence the National Church's intent are highly relevant and should be presented for a jury to consider as evidence of the National Church's intentions regarding a trust. Myriad questions remain about the National Church's conduct and its intentions including: Did the National Church fail to ask CCS for a trust deed because it knew full well that it had no trust and so there was no need to try and get one? Did the National Church know that it could get a trust deed only if CCS would give it one, and so it elected to try to obtain CCS's land with a lawsuit? Is its failure to ever ask CCS for a deed evidence that the National Church never contended that it had a trust on CCS's property? On what basis did the National Church claim a trust? Does the National Church claim a trust in good faith?

This Court is prohibited by law from granting summary judgment when so many fundamental fact issues are disputed, including the fact issue of intent that the majority opinion considers to be dispositive.

### V. *Corporate Status of CCS*

The majority opinion also ignores the separate existence of CCS as an active nonprofit corporation distinct from the National Church, and the majority erroneously bases today's opinion on actions taken by the Bishop of the National Church after CCS disaffiliated from the National Church to control the internal corporate affairs of CCS. Recall that the initial deeds in this case were to CCS's corporation with official name, "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah." The records of the Secretary of State establish that "The Rector, Church Wardens and Vestrymen of Christ Church in Savannah" remains an active nonprofit corporation today that was first incorporated in December 1789.

Crucially, however, when CCS disaffiliated from the National Church in 2007, CCS dissociated as a member church. Thereafter, CCS had no legal ties to the National Church, and the National Church had no legal ties to CCS. The majority identifies no evidence

in the record suggesting that CCS as an active corporation delegated any of its authority to the National Church to declare a vacancy in the offices of church wardens and vestrymen (CCS's board of directors), or delegated to the Bishop, who represented the National Church's interests, the authority to declare said vacancies and to unilaterally fill these vacancies. Yet, after CCS disaffiliated with the National Church, and without any ostensible authority to do so, the Bishop took control of this active corporation, over which he had no legal authority, and did exactly that. By what authority could the Bishop dismiss the rector, wardens and vestrymen from the corporation by this name after CCS disaffiliated with the National Church?

In my view, when CCS disaffiliated with the National Church, any corporate control or authority that the Bishop may have had over CCS effectively disappeared. That is, the Bishop had no cognizable legal authority to declare the existing offices in an active corporation vacant and unilaterally fill those vacancies. My conclusion is bolstered by the language of the Dennis Canon itself, which establishes that the Dennis Canon does not apply until a local church disaffiliates from the National Church. As a result, when the Bishop declared the existing offices of the active corporation CCS vacant and proceeded to fill those vacancies, this evidences the fact that consistent with the Dennis Canon, the National Church acknowledged that CCS had disaffiliated from the National Church but that the National Church nevertheless asserted control over the internal corporate affairs of CCS through the Bishop's actions, despite having no cognizable legal authority to do so. As a result, the Bishop's conduct may be entirely ultra vires, and therefore, unlawful under the Georgia Nonprofit Corporation Code, OCGA § 14-3-101 et seq.

It appears from the record that the Bishop performed these acts without any legal authority to do so after CCS terminated its relationship with the National Church. See generally OCGA § 14-3-302 (explaining that all nonprofit corporations have "the same powers as an individual to do all things necessary or convenient to carry out its business and affairs, including without limitation power: . . . (3) To make and amend bylaws, not inconsistent with its articles of incorporation or with the laws of this state, for regulating and managing the affairs of the corporation; . . . (10) To conduct its activities, locate offices, and exercise the powers granted by this chapter within or without this state; (11) To elect or appoint directors, officers, delegates, employees, and agents of the corporation, define their duties, fix their compensation, and lend them money and credit; . . . (16) To establish conditions for admission of members, admit members, and issue memberships; (17) To carry on a business; and (18) To do all things necessary or convenient, not

inconsistent with law, to further the activities and affairs of the corporation.'').

Notably, the majority opinion fails to identify any legal authority for the Bishop to control the internal corporate affairs of CCS, which remained an active nonprofit corporation. The majority's willingness to endorse the actions taken by the Bishop, after CCS disaffiliated from the National Church, to control the internal affairs of CCS, is perplexing in light of the fact that the Bishop's actions appear to violate the plain language of OCGA § 14-3-302. In my view, it is confounding that neither the National Church nor the majority opinion endeavor to identify any Georgia law that gives the Bishop power to control the internal corporate affairs of CCS after CCS disaffiliated from the National Church.

Further, any argument by the majority that the Bishop had the right to act to control CCS's internal corporate affairs because there is case law holding that courts will not interfere with the internal workings of church organizations is inherently flawed. The doctrine set forth in that case law has no application to cases where, as here, the active corporation involved is no longer part of the broader church organization. The application of that doctrine would apply only to hold that the National Church has no power to interfere with CCS's internal corporate affairs, and this Court cannot interfere with CCS's statutory right to control its own affairs. See OCGA § 14-3-302. Despite the majority's baffling views to the contrary, CCS has the right to control its own affairs free from the Court's intervention and free from the National Church's intervention through the Bishop.

### VI. *Absence of Any Express or Implied Trust as a Matter of Law*

There is no dispute about the source and dignity of CCS's original title in the subject property. CCS acquired its title to the various tracts of land at issue in this case by land grants and by deeds. The earliest of these conveyances traces back to 1733 when Christ Church was founded after the arrival of the original colonists. If a title lawyer were to bring CCS's title in the subject property forward in time, the lawyer's title search would reveal no transfer of title from CCS to another entity, such as by producing a valid deed that is effective to pass title from CCS to the National Church. See *Curry v. Curry*, 267 Ga. 66, 68 (473 SE2d 760) (1996) (''Among the essential elements of a deed are a written instrument, description identifying the land, grantor's signature, and delivery to the grantee''). Additionally, Pindar's Georgia Real Estate Law and Procedure, 2 Ga. Real Estate Law & Procedure § 19-15 (6th ed.), describes the basic essentials of a valid deed effective to transfer title

to real property as follows:

> To produce a valid deed effective to pass title to real property, there are certain basic elements which must exist:
> a. A written instrument purporting to convey title to land.
> b. A grantor, that is a person or legal entity possessing contractual powers.
> c. A grantee, who must be a legal entity, but need not necessarily be competent or sui juris.
> d. Words of conveyance.
> e. A description sufficient to identify the land.
> f. Signature of the grantor.
> g. Delivery of the instrument to the grantee or to someone on his behalf.

OCGA § 44-5-30 points out two other requirements which cannot be considered basic, since the deed is valid between the parties in their absence:

> a. A good or valuable consideration. A deed of gift may be valid, without any of the ingredients of a valuable consideration as required for contracts generally.
> b. Attestation by at least two witnesses.

The National Church has not produced a valid deed that would be effective to pass title in the subject property from CCS to the National Church in order to create a trust, though under Georgia law, no trust exists absent a valid deed being recorded. See OCGA § 53-12-25 (b). Further, there is no evidence on the record that any grantor with contractual powers on CCS's behalf, such as CCS's agent, ever had sufficient authority to convey CCS's title in the subject property to the National Church by signing any form drafted by the National Church. As a result, the proper resolution of this case turns on whether, before the split between CCS and the National Church in 2007, CCS had done anything to transfer any property to, or otherwise establish a trust on the local church's property in favor of, the National Church. The evidence available would say no — especially under existing Georgia law. If existing Georgia law provided for any legally recognized trust, there would be no need to declare a new type of implied trust in order to find that a trust existed here. Moreover, no new type of implied trust could legitimately operate retroactively to penalize CCS as the majority

opinion attempts to do today.

## A. Express Trust

The majority acknowledges that no express trust was created on the local church's property for the benefit of the National Church, pursuant to the express trust statute, OCGA § 53-12-20. Maj. Op. at 103. I wholly agree with the majority that there is no express trust that comports with OCGA § 53-12-20, which defines the essential requirements of an express trust in Georgia. Here, contrary to the plain language of OCGA § 53-12-20, there is no writing creating an express trust; no signature by any settlor or agent of the settlor; no expressed intention by any settlor to create an express trust (assuming that we had any identified settlor of any trust, which we do not since neither CCS nor the National Church claim to have settled any trust, and there are no other candidates for settlor); and no trustee duties specified in writing. Therefore, I agree with the majority insofar as it concludes that there is no express trust on the property of the local church for the benefit of the National Church that complies with OCGA § 53-12-20.

However, I strongly disagree with the majority opinion's related conclusion that if this Court required that the National Church and other hierarchical churches fully comply with OCGA § 53-12-20, it would create an "immense" burden on national and local churches that would require "an enormous number of deeds and corporate charters would need to be examined and reconveyed or amended." Maj. Op. at 102. This imaginary burden on the National Church amounts to an excuse by the majority that gives the National Church privileges at law, completely unlike the privileges given to any other legal entity, to ignore and fail to comply with Georgia laws. The National Church did not ask to be relieved from complying with the state statutes that would require the National Church to file a deed before claiming a trust interest. The fact that the National Church never asked to be forgiven from following Georgia statutory laws and the dictates of *Jones* evidences that the National Church did not contend that the Dennis Canon would be interpreted by this Court as creating a trust interest on CCS's property. Because the majority contends that divining the parties' intentions is the ultimate goal here, this intention of the National Church is directly relevant to finding a trust or not.

I also question whether this Court has any power to waive a party's duty to obtain and record appropriate deeds before declaring a trust to exist. Even so, there is no evidence of any substantial burden that would justify the majority granting the National Church the privilege of not complying with longstanding Georgia laws or with *Jones*. In fact, the only deed that would have had to be obtained is a deed from CCS to the National Church. That is a $200 burden at

most. Further, it remains unclear whether this Court forgives only this National Church or all hierarchical churches regarding the legal requirements to obtain and record deeds to property or whether this Court's forgiveness extends to nonhierarchical churches and non-churches as well. However, assuming that the majority's unsolicited forgiveness is reserved only for the National Church, hasn't today's majority opinion effectively furthered the establishment of this church in direct violation of the Establishment Clause of the First Amendment?

Perhaps the National Church could not obtain a deed because CCS would not give it a deed, but this has nothing to do with the burdens or costs associated with the National Church drafting and recording a deed. The majority's unsubstantiated claim that the costs of complying with the law would be too high is simply not supported by any evidence. The National Church's financial outlook would be improved significantly even if it was required to get deeds from every local church in the United States and if all it received nationwide was this one church from Christ Church in Savannah, Georgia. In any event, the imagined burdens if the National Church had to comply with the law cannot excuse the National Church from being required to comply with the laws that exist to protect all citizens.

Assume that the National Church owns only 7,500 local Episcopal churches across the United States. If it costs the National Church $200 per church for a lawyer to prepare and execute one valid deed per church even though most local churches would have a lawyer-member who would do it for free, then the National Church would have spent $1,500,000 ($200 x 7,500 churches = $1,500,000) in order to obtain properly executed deeds to all 7,500 local parishes. That assumes that the National Church would need deeds from all local churches. It may not if some churches already have a trust in their corporate charter, or a reversionary clause to the National Church in their deeds as described by the *Jones* Court.

Assume also that each of the 7,500 local churches affiliated with the National Church across the United States average only $1,000,000 in property value per local church, then the result of the National Church not needing to abide by Georgia laws and the laws of other states requiring deeds would yield in time $7,500,000,000 (7.5 billion dollars) in profits for the National Church (7,500 local churches x $1,000,000 in property per church = $7,500,000,000). Moreover, with this case alone, the National Church receives legal title to real property worth at least several million dollars in terms of the parcel's aggregate property value as well as whatever money CCS had on hand, including one building on which CCS borrowed $950,000 to renovate, with the approval of the National Church.

Again, assuming that the subject property here is worth $5,000,000 in an arms length real estate transaction, the National Church's initial $1,500,000 investment in order to comply with the applicable laws for all 7,500 local churches across the United States would yield to the National Church a $3,500,000 net profit on this one transaction involving only this local church, plus the many billions of dollars of cash and other property of all of the local churches across the United States. Simplifying the numbers to deal only with this local church and the subject property at issue here, the benefit to cost ratio realized by the National Church on this local church is 5,000,000/200 or, a cost/benefit ratio of 25,000! In light of these calculations, I am mystified by the majority's unsubstantiated assertion that complying with the plain language of OCGA § 53-12-20 creates some sort of immense burden on the National Church justifying excusing the National Church from compliance with Georgia laws and the United States Supreme Court's decision in *Jones*. The majority's opinion is a bonanza for the National Church, and would not be a burden even if the National Church had to comply with the same laws all other citizens of this state must comply with regarding obtaining and filing deeds to record one's property interest.

Further, I question whether this Court or any other court has the right to give the National Church such preferential treatment especially where, as here, the preferential treatment afforded to the National Church by the majority opinion ultimately permits it to prevail over CCS in this church property dispute. This gift to the National Church to ignore *Jones* and various applicable Georgia laws regarding deeds would be invalid as an establishment of religion even if it costs CCS nothing. But, here, this furtherance in the establishment of the National Church by this Court gives to the National Church a generous gift worth several million dollars. All other legal entities — individuals, corporations, trusts, partnerships, LLCs, and investment clubs — have to pay for properly recorded deeds. Yet, the National Church wins this fight without ever having to proffer any deeds to establish its interest in the subject property. What happened to the *Jones* Court's mandate that we look to neutral principles, including deeds, to determine whether a trust exists? Does today's decision annul *Jones*? Why should this Court give the National Church a gift worth several million dollars?

**B. Implied Trust**

The majority opinion bypasses altogether whether this Court can find an implied trust under the Georgia statutes addressing the elements of an implied trust. See, e.g., OCGA §§ 53-12-130 and 53-12-132. If the majority had consulted the definition of an implied trust set forth in OCGA § 53-12-2 (5), the majority would have found

that under Georgia law, there can be no implied trust under the facts of this case. Therefore, the majority declares a new type of implied trust in violation of existing Georgia law.

OCGA § 53-12-2 (5) defines an "implied trust" as meaning "a resulting trust as described in Code Section 53-12-130 or a constructive trust as described in Code Section 53-12-132." No party claims any resulting trust, pursuant to OCGA § 53-12-130, so this leaves us to consider only constructive trusts, pursuant to OCGA § 53-12-132. Therefore, the statutory language defining a constructive trust is critical. OCGA § 53-12-132 defines the essential requirements of an implied trust under a constructive trust theory as follows:

> (a) A constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity.
>
> (b) The person claiming the beneficial interest in the property may be found to have waived the right to a constructive trust by subsequent ratification or long acquiescence.

Since no one claims that CCS acted fraudulently toward the National Church or anyone else for that matter, there is no basis to imply a constructive trust under the plain language of OCGA § 53-12-132 (a).

Moreover, the facts of this case permit the court to imply a trust in favor of CCS for any interest that the National Church claims in CCS's property under OCGA § 53-12-132 (b). At a minimum, there is a genuine issue of material fact for a jury to resolve regarding whether the National Church, as the party claiming a beneficial interest in the property, "may be found to have waived the right to a constructive trust by subsequent ratification or long acquiescence" in light of the National Church's silence since its formation about any claimed trust on CCS's property. OCGA § 53-12-132 (b). Since the National Church undisputedly failed to ever assert any trust interest in the subject property, this provides a factual basis for a jury to determine that the National Church waived any beneficial interest in the property by its longtime acquiescence to CCS's ownership and control of the property. How long does the National Church claim that it can remain silent about its contention of a trust before CCS can assume that there is no such claim and act accordingly? This is a matter for jury determination in light of OCGA § 53-12-132 (b). Has the National Church acquiesced in there being no contention of a trust? Does this Court claim that it can hold as a matter of law that the National Church had not waited too long and so

acquiesced or waived its right to claim any trust pursuant to OCGA § 53-12-132 (b)? How can this Court do so without the facts being fully developed at trial?

Furthermore, in light of the plain language of OCGA §§ 53-12-130 and 53-12-132, there simply is no implied trust of any type on the property of the local church for the benefit of the National Church that complies with applicable Georgia statutes. Therefore, the majority's new species of implied trust — a trust implied pursuant to neutral principles — is inconsistent with Georgia's longstanding implied trust statutes. Which creator of trust, the Legislature or this Court, prevails where, as here, their separate creations are internally inconsistent with each other? Can this Court judicially create a new type of implied trust that conflicts with the existing implied trust statutes?

After the majority conceded that there is no express trust that complies with Georgia's express trust statute and the majority failed to find an implied trust that complied with Georgia's implied trust statutes, the majority should have stopped its analysis and concluded that no trust existed under Georgia statutory law. Instead, today's majority opinion proceeds to find an implied trust in favor of the National Church based on the title instruments, statutes, and local and national church documents that the majority previously admitted did not create an express trust. A careful reader is left wondering how one can find an implied trust by looking at documents that would ordinarily evidence an express trust if an express trust existed; finding no express trust but finding that the same documents that do not create an express trust, magically create an implied trust under a new judicially-generated statutory equivalent that does not comply with the Georgia law of implied trusts. As stated, the majority opinion proceeds to retroactively apply its new variety of implied trust here after the majority opinion fails to find an implied trust, as it could not under the Georgia statutes addressing implied trusts, because there has been no alleged fraud or bad acts by CCS. Therefore, the majority's new type of implied trust cannot exist under Georgia law because the judicial creation of a new type of implied trust violates the Separation of Powers Clause of the Georgia Constitution.

The end result of this long discussion is that there is neither an express trust; nor is there any resulting trust; nor is there any constructive trust implied on CCS's property that comports with Georgia statutory and constitutional law preventing judicial legislating. Likewise, the new type of implied trust created by this Court usurping the role of the Legislature is not defined by the majority opinion so that we can know what the majority means by it, or how it should apply in future cases. Even if we did know, this is the functional equivalent of a judicially-created state statute involving a

new type of implied trust, and it is void as being contrary to an actual statute, OCGA § 14-5-46. It also is constitutionally void as being retroactively rather than prospectively applied, pursuant to the Georgia Constitution. See *Recycle & Recover, Inc. v. Ga. Bd. of Natural Resources*, 266 Ga. 253, 254 (2) (466 SE2d 197) (1996) ("[O]ur Constitution forbids passage of retroactive laws which injuriously affect the vested rights of citizens. Thus, if [a citizen] has a vested right which would be injuriously affected by application of the amendment . . . , then our Constitution requires that that amendment be applied prospectively rather than retroactively." (citations omitted)). This new judicially-generated type of implied trust also violates the Separation of Powers Clause of the Georgia Constitution as discussed infra.

**VII. *State Statutes or Constitutional Provisions Ignored or Misapplied by the Majority***

### A. Duty to Follow State Law

Georgia statutory law, case law, and constitutional law undisputedly govern the proper resolution of this church property dispute. See Pindar's Georgia Real Estate Law and Procedure, 2 Ga. Real Estate Law & Procedure § 1-4 (6th ed.), p. 6 ("The law of Georgia controls and governs all real property within the state, both with respect to its acquisition, ownership, disposition, and evolution."); see also *Chidsey v. Brookes*, 130 Ga. 218, 220 (60 SE 529) (1908) ("It is an acknowledged principle of law that the title and disposition of land is exclusively subject to the laws of the State where it is situated, and which alone can prescribe the mode by which title can pass from one person to another.").

The economy of our state is founded on the principle of stable property law because, unless our rights to property are secure under the law, no one has any incentive to excel in the market so as to gain funds in order to acquire property. Yet, in this case, the law does not protect CCS's property, by allowing the National Church to take CCS's property without any deed, without any corporate authorization from CCS to convey its property, and without the benefit of any statutes that would allow for such transfer, and permitting the National Church, in effect, to transfer CCS's property to itself in violation of its statutory duty to act in the utmost good faith toward its confidential relation CCS. In the topsy-turvy world envisioned by the majority opinion, for what reason would an entity like CCS ever decide to buy or improve property for the benefit of the local community if it would lose its property contrary to the terms of any Georgia statute?

### B. OCGA §§ 14-5-46 and 14-5-47

Today's majority opinion also misapplies the statutory language

of OCGA §§ 14-5-46 and 14-5-47 in a manner that belies the United States Supreme Court's explanation of neutral principles of law in *Jones*. At the time it was enacted in 1805, OCGA § 14-5-46 unambiguously granted CCS full and absolute title in the subject property, providing that:

> All deeds of conveyance . . . *are and shall be deemed and taken to be good and valid, and available in law*, for the intents, uses and purposes contained in such deeds of conveyance: and all lots of land so conveyed, *shall be fully and absolutely vested in such church or religious society, or in their respective trustees, for the uses and purposes in the said deed expressed*; to be *Holden to them* or their trustees *for their use, by succession*, according to the mode of church government, or the rules of discipline exercised by such churches or religious societies respectively.

(Emphasis added.) By its plain language, OCGA § 14-5-46 commands that all deeds will be deemed valid and available in law for the uses contained in those deeds. Thus, this first part of OCGA § 14-5-46 provided that the legal title remains in the grantee, CCS, and that the deed will be deemed valid in law in case of any trust. OCGA § 14-5-46 then provided that all lands conveyed shall be "fully and absolutely vested" in CCS "for the uses and purposes in the said deed expressed." The term "absolute" includes in its dictionary definition that it cannot be taken by government or by government action. See Black's Law Dictionary (8th ed.) (defining the term "absolute" as "1. Free from restriction, qualification, or condition. 2. Conclusive and not liable to revision. 3. Unrestrained in the exercise of governmental power."). As a result, not even this Court could deprive CCS of its fully and absolutely vested deeds that are vested in CCS for church purposes as expressed in the deeds. The statute further provided that the deed shall "be Holden" or held by them obviously referring to CCS and that title shall be held by these grantees "for their use[ ] by succession," with succession being "according to the mode of church government[ ] or the rules of discipline exercised by such churches or religious societies." The reference to "succession" of trustees by use of "the mode of church government[ ] or the rules of discipline" refers only to the mode and manner of succeeding trustees. Counsel for the National Church agreed to this interpretation of OCGA § 14-5-46 during oral argument.

Because title in the subject property is not vested in any trustee, it is unnecessary to have to deal with any successive trustees or otherwise incorporate by reference use of the Dennis Canon as a mode of church government or the rule of church discipline to find

out how and by what rules trustees are succeeded. Under *Jones*, this Court cannot resolve this case on the basis of the mode of church government insofar as it relates to doctrinal disputes or internal practices. See *Jones*, 443 U. S. at 602 ("[T]he First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice."). This constitutional concern is consistent with the *Jones* Court's overall goal that when properly applied, the neutral principles approach "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." Id. at 603. In any event, the Dennis Canon does not provide for the succession of trustees and is nowhere even claimed to be incorporated except by this last phrase of OCGA § 14-5-46, which has no application to this case.

The majority opinion also misunderstands the unambiguous language of OCGA § 14-5-47, which states:

> All trustees to whom conveyances are or shall be executed, for the purposes expressed in Code Section 14-5-46, shall be subject to the authority of the church or religious society for which they hold the same in trust and may be expelled from said trust by such church or society, according to the form of government or rules of discipline by which they may be governed.

OCGA § 14-5-47, by its plain and unambiguous terms, applies when, and only when, there is a conveyance to trustees. Because there are no trustees identified in CCS deeds, OCGA § 14-5-47 is wholly irrelevant to the facts of this case.

Perplexingly, however, the majority largely ignores the unambiguous statutory language and instead bases its analysis of OCGA §§ 14-5-46 and 14-5-47 on prior case law. Under *Jones*, case law that interprets a statute is not a neutral principle. The statute is the neutral principle and not the case law. Moreover, all of the parties in this case acknowledge that the case law relied upon by the majority opinion was founded on a mistaken interpretation of OCGA § 14-5-46. For example, the majority relies upon *Carnes* for the proposition that this Court can utilize the last phrase of OCGA § 14-5-46 to incorporate church government and the rules of church discipline. Yet, the *Carnes* case predated the *Jones* case by more than three years because the United States Supreme Court decided *Jones* in 1979 and the Supreme Court of Georgia decided *Carnes* in 1976. Therefore, it seems improper to allow the Supreme Court of Georgia's decision in *Carnes* to overrule the United States Supreme Court's subsequent decision in *Jones*.

Prior case law is not a neutral principle for good reason; prior case law represents mere opinions regarding state statutes. Where

conflicts exist between statutes and prior cases interpreting these statutes, the statute should logically control, especially when no party claims that the cases misinterpreting these statutes are anything but a mistaken interpretation. This is what counsel for the National Church admitted with integrity at oral argument. Statutes are codified when written and enacted by the Legislature. Courts can vary on questions of statutory interpretation, but courts cannot change the plain language of state statutes. It is the codified statute, and not the statutory language as interpreted by a court, that is a neutral principle under *Jones*. Therefore, the majority's reliance on the various cases, including *Carnes, Crumbley, Barber, Kemp,* and *Timberridge*, are not neutral principles under *Jones*, and these prior cases should not control the outcome of this case in ways that conflict with *Jones* or the applicable state statutes. Rather, it is the plain language of OCGA § 14-5-46, which unambiguously granted CCS full and absolute title in the subject property, that controls the outcome here. Similarly, it appears that CCS also had full and absolute title by virtue of the adverse possession statute, OCGA § 44-5-164, in that at the time of *Jones*, it had owned its property for roughly 221 years. The adverse possession statute only requires seven years of possession of real property under a deed in order to have virtually attack-proof title. Consequently, not even this Court could take CCS's title in the subject property under the applicable state statutes.

### C. List of State Statutes and Constitutional Provisions

Each of the following relevant state statutes and constitutional provisions are neutral principles under *Jones*, that either were not considered or properly applied by today's majority opinion. Each provision would, if considered and properly applied, preclude the National Church from obtaining a victory in this case.

***Property Statutes***:

- OCGA § 14-5-46 — "All deeds of conveyance . . . are and shall be deemed and taken to be good and valid, and available in law, for the intents, uses and purposes contained in such deeds of conveyance: and all lots of land so conveyed, shall be fully and absolutely vested in such church or religious society, or in their respective trustees, for the uses and purposes in the said deed expressed; to be Holden to them or their trustees for their use, by succession, according to the mode of church government, or the rules of discipline exercised by such churches or religious societies respectively."

- OCGA § 44-5-30 — "A deed to lands must be in writing, signed by the maker, and attested by at least two witnesses. It must be delivered to the purchaser or his representative and be made on a good or valuable consideration. The consideration of a deed

may always be inquired into when the principles of justice require it."

- OCGA § 44-5-164 — "Possession of real property under written evidence of title in conformance with the requirements of Code Section 44-5-161 for a period of seven years shall confer good title by prescription to the property against everyone except the state and those persons laboring under the disabilities stated in Code Section 44-5-170, provided that, if the written title is forged or fraudulent and if the person claiming adverse possession had actual notice of such forgery or fraud when he commenced his possession, no prescription may be based on such possession."

*Agency Statute*:

- OCGA § 10-6-2 — "Where the exercise or performance of an agency is by written instrument, the agency shall also be created by written instrument; provided, however, unless a contrary intent is expressly set forth therein, any written instrument creating an agency regardless of the formality of its execution shall conclusively be deemed to authorize the execution of instruments with the formalities necessary or appropriate to accomplish the purposes for which the agency was granted. A corporation may create an agent in its usual mode of transacting business and without its corporate seal. Any deed or other instrument executed under seal pursuant to an agency created by an act not under seal, if not otherwise required to be under seal for its validity, shall be binding upon the principal and valid as if an unsealed instrument."

*Trust Statutes*:

- OCGA § 53-12-2 — "As used in this chapter, the term: . . . (3) 'Express trust' means a trust as described in Code Section 53-12-20. . . . (5) 'Implied trust' means a resulting trust as described in Code Section 53-12-130 or a constructive trust as described in Code Section 53-12-132. . . . (11) 'Settlor' means the person who creates the trust, including a testator in the case of a testamentary trust. . . . (13) 'Trust' means an express trust or an implied trust but shall not include trusts created by statute or the Constitution of Georgia. (14) 'Trust instrument' means the document, including any testamentary instrument, that contains the trust provisions. (15) 'Trust property' means property the legal title to which is held by the trustee. . . . (16) 'Trustee' means the person or persons holding legal title to the property in trust."

- OCGA § 53-12-6 (a) — "Trusts are peculiarly subjects of equity jurisdiction. Suits by or against a trustee which sound at law

may be filed in a court of law."

- OCGA § 53-12-20 — "(a) Except as provided in subsection (d) of this Code section, an express trust shall be created or declared in writing and signed by the settlor or an agent for the settlor acting under a power of attorney containing express authorization. (b) An express trust shall have, ascertainable with reasonable certainty: (1) An intention by a settlor to create such trust; (2) Trust property; . . . (4) A trustee; and (5) Trustee duties specified in writing or provided by law. . . ."

- OCGA § 53-12-23 — "A person has capacity to create an inter vivos trust to the extent that such person has legal capacity to transfer title to property inter vivos. A person has capacity to create a testamentary trust to the extent that such person has legal capacity to devise or bequeath property by will."

- OCGA § 53-12-25 — "(a) Transfer of property to a trust shall require a transfer of legal title to the trustee. (b) For any interest in real property to become trust property in a trust of which any transferor is a trustee, the instrument of conveyance shall additionally be recorded in the appropriate real property records."

- OCGA § 53-12-132 — "(a) A constructive trust is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity. (b) The person claiming the beneficial interest in the property may be found to have waived the right to a constructive trust by subsequent ratification or long acquiescence."

***Equity Statutes***:

- OCGA § 23-1-3 — "Equity jurisdiction is established and allowed for the protection and relief of parties where, from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done."

- OCGA § 23-1-6 — "Equity is ancillary, not antagonistic, to the law; hence, equity follows the law where the rule of law is applicable and follows the analogy of the law where no rule is directly applicable."

- OCGA § 23-1-10 — "He who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action."

- OCGA § 23-1-12 — "The equity of a party who has been misled is superior to that of the person who willfully misleads such party."

- OCGA § 23-1-16 — "He who takes with notice of an equity takes subject to that equity."
- OCGA § 23-1-23 — "Where the rules of construction will allow, equity seeks always to construe conditions subsequent into covenants and to relieve against forfeitures."
- OCGA § 23-1-25 — "Equity gives no relief to one whose long delay renders the ascertainment of the truth difficult, even when no legal limitation bars the right."
- OCGA § 23-2-2 — "Great inadequacy of consideration, joined with great disparity of mental ability in contracting a bargain, may justify equity in setting aside a sale or other contract."
- OCGA § 23-2-51 — "(a) Fraud may be actual or constructive. (b) Actual fraud consists of any kind of artifice by which another is deceived. Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. (c) Actual fraud implies moral guilt; constructive fraud may be consistent with innocence."
- OCGA § 23-2-52 — "Misrepresentation of a material fact, made willfully to deceive or recklessly without knowledge and acted on by the opposite party or made innocently and mistakenly and acted on by the opposite party, constitutes legal fraud."
- OCGA § 23-2-53 — "Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
- OCGA § 23-2-57 — "Fraud may not be presumed but, being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence."
- OCGA § 23-2-58 — "Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."
- OCGA § 23-2-59 — "Where, by the act or consent of parties or the act of a third person or of the law, one person is placed in such relation to another that he becomes interested for him or with him in any subject or property, he is prohibited from acquiring rights in that subject or property which are antagonistic to the person with whose interest he has become associated."

- OCGA § 23-2-60 — "Fraud will authorize equity to annul conveyances, however solemnly executed."

**Constitutional Provisions:**

- U. S. Const. Amend. 1 — "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."
- Ga. Const., Art. I, Sec. I, Par. I — "No person shall be deprived of life, liberty, or property except by due process of law."
- Ga. Const., Art. I, Sec. I, Par. XI — "The right to trial by jury shall remain inviolate, except that the court shall render judgment without the verdict of a jury in all civil cases where no issuable defense is filed and where a jury is not demanded in writing by either party. . . ."
- Ga. Const., Art. I, Sec. II, Par. III — "The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."

All of the above-listed state statutes are neutral principles under *Jones*. CCS has the right to insist that this Court properly apply these pertinent state statutes and constitutional provisions to ensure the protection of CCS's legal rights.

If this Court applied all of the applicable state statutes, which are neutral principles under *Jones*, it is unclear on what basis, if any, the majority would allow the National Church to create a trust on somebody else's property for the benefit of the National Church despite OCGA § 23-2-59 expressly precluding the National Church's wrongful attempt to acquire rights in CCS's property that are antagonistic to its confidential relation CCS. See OCGA § 23-2-59 (*"Where, by the act or consent of parties or the act of a third person or of the law, one person is placed in such relation to another that he becomes interested for him or with him in any subject or property, he is prohibited from acquiring rights in that subject or property which are antagonistic to the person with whose interest he has become associated."* (emphasis added)). Similarly, it is unclear on what basis, if any, the majority would allow the National Church to transfer CCS's property to itself without even a deed or any other writing that complies with Georgia laws requiring deeds to be in writing and witnessed by two people so as to protect against ultra vires transfers such as this. See OCGA § 44-5-30 ("A deed to lands must be in writing, signed by the maker, and attested by at least two witnesses. . . ."). Although the majority also fails to mention the many

laws designed to protect citizens from fraud and deceit, it is beyond serious dispute that these state statutes are neutral principles under *Jones* as well. Furthermore, I would conclude that the parties' failure to argue each and every one of the above-listed statutes in the lower courts does not necessarily preclude this Court from considering and applying all of the applicable state statutes in resolving this case, unless the state statute involves an affirmative defense set forth in OCGA § 9-11-8 (c). To hold otherwise would make the outcome of a case dependent on the skill of the lawyers with regard to identifying and arguing all of the applicable state statutes, rather than dependent on the language of the law itself, which appears to run afoul of various state statutes regarding equity. See generally OCGA §§ 23-1-3, 9-3-3. In my view, it is this Court's responsibility to evaluate and apply all of the applicable laws in resolving this case on appeal, just as "[i]t is for the trial court to evaluate if a jury instruction is applicable, supported by evidence in the record, and an accurate statement of the law." 75A AmJur2d Trial § 921.

It is important to underscore that all of the above-listed state statutes are neutral principles under *Jones*. The historical narrative detailed at length by the majority under the guise of church governing documents is not a neutral principle under *Jones*. Moreover, prior cases, including *Carnes*, that rely on what all parties now agree is the mistaken statutory interpretation of OCGA § 14-5-46 are not neutral principles of law. Further, OCGA § 14-5-47, which by its plain unambiguous terms applies only when there is a conveyance to trustees, is a neutral principle. But, prior cases that hold that this Code section applies to deeds that do not convey title to trustees are not neutral principles. Thus, OCGA § 14-5-47 has no application to the facts of this case. Nevertheless, the majority relies on cases misapplying both OCGA § 14-5-46 and OCGA § 14-5-47 as controlling "policy" or, in fact, neutral principles here. Maj. Op. at 100. I strongly disagree with this determination by the majority.

The majority's logic in this case is confounding. The statutes do not apply as written. Yet, a court case mistakenly said they did apply to similar situations. The majority thus uses as a neutral principle to determine whether a trust exists or not, prior case law that all parties hereto agree mistakenly held these statutes to apply to similar facts, in lieu of the statutes themselves. The result is that the majority transforms the statutory language enacted by the Legislature by filtering state statutes through bad case law that all parties agree misinterpreted the statutes. Which, as between good statutes and bad case law, is a neutral principle?

## VIII. *Equitable Relief and Estoppel*

Equity jurisdiction is involved in every aspect of trust law. See OCGA § 53-12-6 (a) ("Trusts are peculiarly subjects of equity

jurisdiction. . . ."). Generally, "[e]quity jurisdiction is established and allowed for the protection and relief of parties where, from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done." OCGA § 23-1-3. In addition, "equity follows the law." OCGA § 23-1-6. Parties seeking equitable relief must themselves strive to do equity. OCGA § 23-1-10. Not only did the National Church fail to strive to do equity in this case, but the National Church also ignored its positive legal duty to fully communicate with its confidential relation CCS and to treat CCS with the utmost good faith. See OCGA § 23-2-58 ("Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."); see also OCGA § 23-2-53 ("Suppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.").

The National Church's failure to comply with these important statutory duties toward its confidential relation CCS is a constructive fraud. See OCGA § 23-2-51 ("(a) Fraud may be actual or constructive. (b) Actual fraud consists of any kind of artifice by which another is deceived. Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another. (c) Actual fraud implies moral guilt; constructive fraud may be consistent with innocence."). Indeed, if this Court gives effect to all of the applicable state statutes, it seems clear that the National Church committed a constructive fraud on CCS by its failure to treat CCS in the utmost good faith and to fully communicate with CCS. This constructive fraud of the National Church should prohibit this Court from allowing the National Church to prevail in this case. Indeed, I would hold that the National Church's failure to communicate with CCS in bad faith since its formation that the National Church claimed a trust on CCS's property provides for an implied trust in favor of CCS on any interest that the National Church arguably acquired in CCS's property. At the very least, that would be an issue for a jury.

Furthermore, the National Church should be estopped from claiming any transfer of title of CCS's property into an implied trust for the benefit of the National Church for at least five reasons:

(1) One equitable basis for estoppel is the National Church's

allegedly deceptive action of referring to an alleged trust in favor of the National Church as a "canon" on the National Church's administrative forms. Both parties should present evidence on the issue of whether the National Church intended to deceive CCS, and a jury should be permitted to resolve this issue. As I discuss elsewhere, the notion of a trust is not included in the meaning of the term "canon" as that term is defined in various dictionaries. The dictionary definition of the term "canon" is "church dogma," and not a "trust."

(2) No agent of CCS signing the National Church's administrative forms is shown to have been clothed with sufficient corporate authority to transfer title to all or substantially all of CCS's property without the prior approval of CCS's board of directors. See OCGA § 10-6-2. In Georgia, an agent must be clothed with authority by a corporate board of directors to transfer corporate assets, including real estate. Yet, no proper corporate approval is shown here. Any transfer by a corporate agent also must comply with the equal dignity rule. See OCGA § 10-6-2; see also Restatement (Third) of Agency § 3.02. Further, none of these administrative forms would survive scrutiny under various state statutes because there was no adequate description of the property to be transferred, no statement from CCS's vestry regarding its intention to transfer its title to the National Church, no witnesses, and no signature of the party to be charged.

(3) The administrative forms relied on as evidence of ratification of the Dennis Canon fail to evidence CCS's intention to transfer title as mandated by the statutory laws governing trust instruments and deeds transferring title described at greater length in the preceding sections.

(4) Ratification is the method of transferring title that the National Church is relying on to claim that the Dennis Canon formed an express trust on CCS's property, but any alleged conveyance by signing an administrative form is woefully inadequate to transfer CCS's title under Georgia law. More specifically, the administrative form does not show that the signatory had any intention to or authority to transfer property and does not contain attestation by two witnesses as required by Georgia statutory law. See OCGA § 44-5-30; see also Curry, 267 Ga. at 68 (describing the essential elements of a deed). CCS was entitled to the protections afforded by Georgia law against the fraudulent or negligent transfer of title in property.

(5) There is no recitation of any evidence in support of a motion for summary judgment that the documents alleged to have been a ratification of the Dennis Canon were properly authorized by CCS's (vestry) board of directors. Absent such a showing, the Court is

precluded from holding that an unauthorized corporate agent's signing such an administrative form operated to transfer title to all of CCS's real estate and other property. See OCGA § 14-5-7; see also *Village Creations, Ltd. v. Crawfordville Enterprises, Inc.*, 232 Ga. 131, 133 (206 SE2d 3) (1974).

## IX. *Dennis Canon*

### A. Distinguishing Bylaws from Church Constitutional Provisions

In this case, the parties agree that the Dennis Canon is most analogous to a bylaw, rather than a constitutional provision of the National Church. One obvious reason for the United States Supreme Court relying in relevant part on "the provisions in the constitution of the general church concerning the ownership and control of church property," *Jones*, 443 U. S. at 603, rather than relying on mere bylaws like the Dennis Canon is that constitutions typically have more rigid rules and requirements governing formation and amendment. Therefore, it seems perfectly reasonable that the United States Supreme Court insisted that any authorization for an alleged trust appear in the provisions of the National Church's constitution or another recognized neutral principle, rather than in its mere bylaws. In light of *Jones*, I would conclude that the Dennis Canon is a mere bylaw of the National Church. Furthermore, because CCS alleges that the National Church enacted the Dennis Canon by deceitful means including, but not limited to, the National Church preventing the local church from knowing in advance that there would be a vote on the Dennis Canon at the 1979 General Convention, CCS claims to have been deceived into not attending or participating in the political process surrounding the enactment of the Dennis Canon. If CCS was deceitfully prevented from using its vote and influence to defeat enactment of this "canon," the Dennis Canon should not be allowed by a court of equity to create a trust on CCS's property. See OCGA § 23-1-10 ("He who would have equity must do equity and must give effect to all equitable rights of the other party respecting the subject matter of the action."); see also OCGA § 23-1-12 ("The equity of a party who has been misled is superior to that of the person who willfully misleads such party."). Because CCS already had full and absolute title in the subject property, any interest that the National Church now claims in the property, the National Church must claim subject to CCS's preexisting legal and equitable interest. I understand that there is some evidence on the record that CCS did have a member attend the 1979 General Convention. However, it does not appear that Judge Brannen attended the 1979 General Convention on behalf of CCS as its official representative. Rather, it appears that Judge Brannen may have attended the 1979 General Convention on behalf of the diocese,

at least according to CCS. Absent a more fully developed record, I would not resolve this issue without first permitting a jury to hear all of the admissible evidence and resolve this apparent factual dispute.

**B. Lower Courts' Holding that CCS is Estopped to Deny the Dennis Canon by its Failing to Deny it Sooner**

One of the primary reasons that the trial court and the Court of Appeals concluded that a trust existed in this case was that CCS had acceded to or ratified certain canons, including the Dennis Canon, and that CCS failed to deny the Dennis Canon. As a rhetorical question, how could CCS deny the Dennis Canon when the National Church allegedly prevented CCS from knowing about the Dennis Canon for almost 20 years after its enactment? Can we forfeit CCS's property to the National Church for CCS's alleged failure to deny the Dennis Canon when CCS alleges that the National Church's deceitful conduct prevented CCS from knowing about the Dennis Canon for many years?

Further, there has been no showing that by ratifying or acceding to certain unspecified canons of the National Church, CCS knew that to the National Church use of the word "canon" had a unique secret meaning entirely different from how lay, legal, and religious dictionaries define the term "canon." The dictionary definition of the term "canon" does not include any mention of ratifying or acceding to a trust. Merriam-Webster Online Dictionary defines the term "canon" in part as "a regulation or dogma decreed by church council" and as "the most solemn and unvarying part of the Mass including the consecration of the bread and wine." Black's Law Dictionary (9th ed.) defines the term "canon" in part as "[a] fixed regular payment or tribute made as a contribution payable to the church." The Catholic Dictionary defines the term "canon" as meaning "morals or religious practices," "the compete list of canonized saints," "the prayer in the Mass in which the Host is consecrated," "a list or writings, esp sacred writings, officially recognized as genuine," and "a piece of music in which an extended melody in one part is imitated successively in one or more other parts." Simply stated, there is no evidence whatsoever that CCS knew that the National Church used the word "canon" to encompass a unique secret definition involving ratifying or acceding to a trust that appears nowhere in the various lay, legal, and religious dictionary definitions of the term "canon."

The conduct of the National Church with regard to its intentional secret meaning of the term "canon" is especially troubling, where, as here, the National Church contends that by having the local church accede to these canons, its intention in so doing was to transfer all of the local church's property to a trust for the benefit of the National Church. That this deceit was the National Church's

express intention is evidenced both by the National Church's intentional misuse of the word "canon" and by the National Church's failure since its inception to even claim any beneficial interest in the local church's property. Consequently, I would reject any argument that a trust existed in this case based on the National Church's claim that CCS had acceded to or ratified certain canons, including the Dennis Canon.

The other main reason for rejecting any claim by the National Church that CCS ratified a trust by having any agent of CCS sign this deceptive administrative form is that ratification does not apply to this scenario. See *Brock v. Yale Mtg. Corp.*, 287 Ga. 849, 855 (700 SE2d 583) (2010) ("To the extent that [plaintiff] merely acknowledged that his wife encumbered her share of the property, that acknowledgment would not evidence an election to treat the forged quitclaim deed as valid."); see also Restatement (Third) of Agency § 4.01 cmt. b (2006) ("The act of ratification consists of an externally observable manifestation of assent to be bound by the prior act of another person.").

Further, the acts claimed to evidence the ratification of a trust by CCS were ratification of acts that benefited the National Church more than those acts benefited the agent, CCS, including the act of buying prayer books from the National Church; the act of joining the National Church's retirement program; the act of CCS hiring graduates of the National Church's seminary; and the act of CCS asking approval to sell or borrow on its own property in order to renovate it. As a result, any claim of ratification based on these acts evidences a certain amount of insincerity on the part of the National Church and creates an inequitable result for CCS. CCS losing millions of dollars worth of real property should not be treated lightly. Equity should deny any trust on this ground alone since equity is involved in all trusts to ensure equity is done, and any claim of ratification made by the National Church on the basis of these acts is not fodder for serious conversation. I note that the majority opinion did not reference these claims of ratification by the National Church. Yet, because the majority does not specifically overrule the lower courts in this regard, I would conclude that these claims merit some discussion.

### X. *Constitutional Implications of Majority Opinion*
### A. Establishment Clause

In *Everson*, 330 U. S. at 8-16, Justice Hugo Black beautifully summarized the troubling history surrounding the enactment of the Establishment Clause and the First Amendment in the United States. For brevity's sake, I only include the following concluding

paragraph from Justice Black's cogent discussion in *Everson*:

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and State." *Reynolds v. United States*, [98 U. S. 145, 164 (25 LE 244) (1878)].

*Id.* at 15-16 (footnotes omitted). I would hold that by virtue of the numerous special privileges bestowed on the National Church by today's majority opinion, this Court has run afoul of the Establishment Clause and furthered the establishment of the National Church. It seems that the majority would give highly preferential legal treatment to hierarchical churches as compared to congregational churches or any other nonhierarchical church. This preference is founded on the National Church's grab for property on account of its church theology, under which church property is sacred according to the church historian hired by the National Church. In addition, the fact that the National Church called the Dennis Canon a "canon" proves that the Dennis Canon is, in effect, the outreach of the National Church's church theology. Therefore, insofar as the majority is enforcing the Dennis Canon, this Court is expressly endorsing "church dogma," which is how various dictionaries define the term "canon," and the endorsement of "church dogma" by this Court directly violates *Jones* as well. See *Jones*, 443 U. S. at 604 ("In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust."). Additionally, all other legal entities, except for hierarchical churches, would be prohibited by Georgia law from establishing trusts on other

people's properties that the settlor of the trust had no power to convey. This violates the Establishment Clause by privileging hierarchical churches over all other legal entities.

Granting a privilege for hierarchical churches to establish a trust on the property of others, even their own member churches, represents a dangerous preference in favor of hierarchical churches in violation of the Establishment Clause. U. S. Const. Amend. 1; Ga. Const., Art. I, Sec. II, Par. VII. It favors hierarchical churches over nonhierarchical churches, and it favors churches over non-churches. Indeed, the National Church improved its financial balance sheet by several million dollars on this one gift of special privilege by today's decision. Under the majority's reasoning, it appears that all settlors of trusts, except for hierarchical churches, would be required to comply with the applicable state statutes, requiring deeds, signed by the grantor, the creation of a trust interest in writing, etc. This represents a troubling effort to favor one type of religion over other religions or nonadherents. As the United States Supreme Court previously observed, " '[a] proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Ed. of Kiryas Joel Village School Dist. v. Grumet*, 512 U. S. 687, 696 (114 SC 2481, 129 LE2d 546) (1994) (citations and punctuation omitted); see also *Larson v. Valente*, 456 U. S. 228, 244-246 (III) (A) (102 SC 1673, 72 LE2d 33) (1982).

**B. Separation of Powers**

The Separation of Powers Clause in the Georgia Constitution provides that "[t]he legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided." Ga. Const., Art. I, Sec. II, Par. III. That is, the Georgia Constitution vests all legislative power in the General Assembly and all judicial power in the courts. See *Thompson v. Talmadge*, 201 Ga. 867, 872 (41 SE2d 883) (1947). Because only the General Assembly can enact, amend, modify, or repeal its own valid statutes, this Court has no power whatsoever "to modify, amend, or repeal a valid constitutional statute enacted by the General Assembly." *Kemp v. Mitchell County Democratic Executive Committee*, 216 Ga. 276, 283 (116 SE2d 321) (1960).

Nevertheless, it appears that this Court has usurped the legislative power of "declaring what the law shall be" by abrogating or misapplying a variety of state statutes of longstanding significance to the facts of this case. See *Thompson*, 201 Ga. at 874 (" 'Legislative power is that which declares what the law shall be; judicial is that which declares what law is, and applies it to past transactions and

existing cases; the one makes the law, the other expounds and judicially administers it; the one prescribes a rule of civil conduct, the other interprets and enforces it in a case in litigation.' ''). The refusal of the majority to apply a variety of state statutes as enacted by the Legislature effectively annuls those state statutes.

Additionally, the judicially-created new type of implied trust that the majority relies on today, amounts to this Court legislating from the bench by ignoring the existing Georgia implied trust statutes and creating a new statutory equivalent to resolve this case that is entirely inconsistent with the existing state statutes regarding implied trusts. In so doing, I would conclude that today's majority opinion violates the Separation of Powers Clause by permitting the majority to fulfill the role of the ultimate legislative body, by creating a new type of implied trust out of whole cloth, which is the functional equivalent of enacting a new state statute, and by cherry-picking which among the many applicable state statutes it will discuss, misapply, ignore, or eviscerate.

### C. Right to Jury Trial and Unresolved Jury Issues

One obvious conclusion that a reader will likely draw after reading this dissenting opinion and the majority opinion is that summary judgment is simply inappropriate at this juncture. The Georgia Constitution enshrines the right to a jury trial in cases such as this where a jury trial has been demanded. Ga. Const., Art. I, Sec. I, Par. XI (a) ("The right to trial by jury shall remain inviolate, except that the court shall render judgment without the verdict of a jury in all civil cases where no issuable defense is filed and where a jury is not demanded in writing by either party. . . ."). Today's majority opinion, like the trial court and the Court of Appeals, resolves this case on the basis of summary judgment without ever mentioning, let alone discussing, the disputed facts in need of jury resolution. The only rationale that I can fathom for this omission by the majority is that any detailed discussion about the sacrosanct right to a trial by jury would show, without question, that CCS is entitled to a jury trial in this case.

Generally speaking, summary judgment is proper under Georgia law, OCGA § 9-11-56 (c), only

> . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law; *but nothing in this Code section shall be construed as denying to any party the right to trial by jury where there are substantial issues of fact to be determined. . . .*

(Emphasis added.) Because there are genuine issues as to one or more material facts here, listed below, the majority opinion errs in affirming the grant of summary judgment in favor of the National Church and the majority opinion compounds its error by its denial of the local church's constitutional right to a jury trial.

(1) Summary judgment is inappropriate, where, as here, many questions of material fact remain about the intentions of CCS and the National Church regarding a trust. See *Holcim (US) Inc. v. AMDG, Inc.*, 265 Ga. App. 818, 821 (596 SE2d 197) (2004) ("Because questions of fact remain as to the parties' intent, the trial court erred in granting AMDG's motion for summary judgment."); see also *Warner Robins Supply Co. v. Malone*, 143 Ga. App. 332, 336 (238 SE2d 709) (1977) ("In this case there was a substantial and material issue of fact as to the meaning and intent of the parties in the preparation and execution of the receipt or release. Accordingly, the trial judge erred in granting appellees' summary judgment."). Here, there are questions about the intentions of the parties in signing and drafting certain administrative forms. Did the National Church intend to deceive by its misuse of the word "canon" when it secretly intended for "canon" to mean "trust"? Did CCS understand the National Church's ploy, or was it deceived? Did the National Church's silence since its creation about its claimed trust interest reveal that it did not intend to form a trust on CCS's property? Alternatively, did the National Church intend by its lengthy silence to lay low so as to spring its claimed trust on CCS when it was too late? Did the enactment of the Dennis Canon reveal that the National Church did not claim any trust interest on CCS's property prior to its enactment in 1979? What did CCS intend when it signed certain administrative forms prepared by the National Church after the enactment of the Dennis Canon? These factual questions surrounding the intention of the parties would, standing alone, mandate a jury trial in this case.

(2) Summary judgment also is inappropriate based on the affidavit of the National Church's expert witness, a church historian, who did not claim to be an expert in law so as to know whether the facts gathered through multiple layers of hearsay and the opinions of unidentified sources should have been found to be a trust of any sort according to the laws of Georgia or any other state. The expert witness's extrapolations from opinions and hearsay appear to set forth the facts found to be essential for a grant of summary judgment by the majority. Yet, an affidavit proffering one expert's opinion, standing alone, cannot be legally sufficient to make any finding of fact without giving a jury the opportunity to weigh all of the evidence and evaluate the expert's credibility. See *Ginn v. Morgan*, 225 Ga. 192, 193-194 (167 SE2d 393) (1969) ("[W]e reach the solid conclusion

that a summary judgment can never issue based solely upon opinion evidence."). Therefore, the affidavit submitted by the National Church's expert witness would necessarily be a defective factual basis for finding any such trust.

(3) Any issues involving the alleged ratification of the Dennis Canon or prior church canons by CCS are jury issues and not matters for summary adjudication. See *Brock*, 287 Ga. at 854. ("Whether ratification occurs is usually a fact question for the jury."). Similarly, there is no reason to assume that ratification was intended by such menial actions as CCS buying prayer books from the National Church. There does not appear to be any possible connection between a local church buying prayer books and a manifestation of one's intention to transfer its valuable title to a trust for the benefit of another entity. In my view, these and similarly strained claims of actions by CCS tending to support ratification made by the National Church are so incredible that it creates a jury issue about the National Church's sincerity in any of its claims.

(4) It is worth emphasizing that the balance of equities in this case strongly favors CCS since there is no claim by the National Church that CCS has done anything secretive, deceitfully, in bad faith, or failed to disclose anything to its confidential relation, the National Church. I would therefore permit a jury to resolve these and other genuine issues of material fact after first having an opportunity to review all of the admissible evidence, hear testimony, and make credibility determinations. In addition, I would hold that the majority errs by denying CCS its constitutional right to a jury trial.

## XI. *Further Response to the Majority Opinion*

Despite the majority's statements to the contrary, see Maj. Op. at 97, it is this dissenting opinion, rather than today's majority opinion, that endeavours to resolve this case based on neutral principles of law as set forth in *Jones* as opposed to what the majority misleadingly characterizes as a "formal title" approach. Unlike the majority, I would insist on using only those neutral principles enumerated in *Jones*. Further, I would not follow the majority down the primrose path of identifying any number of non-neutral principles as neutral principles, such as church history and the Dennis Canon. The majority's undisciplined analysis of neutral principles simply does not comport with the language or the spirit of *Jones*. For example, under the majority's peculiar reasoning, this Court concludes that the National Church intended to form a trust on CCS's property based in large part on a skewed church history and documents that predate the existence of the National Church itself. Only under the topsy-turvy reasoning of the majority opinion could this Court conclude that the National Church intended to form a trust based on

the National Church's professed intentions before the National Church even existed.

Additionally, the majority opinion is apparently so confused about the meaning of *Jones* that the majority considers the intention of the parties over the span of an approximately 250-year period of the history to be controlling rather than the intention revealed in the neutral principles themselves. CCS certainly is not bound by any purported intentions expressed in the church history submitted by the National Church's expert witness for the express purpose of this litigation. Further, it is worth noting that the prior church canons of the 19th Century, relied on by the majority opinion and the National Church's church historian, clearly do not establish a trust. These prior canons are directives as often to the diocese as to the local church, and they do not claim any right to tell the local churches for what purpose each local church holds its own deeds and property. In addition, these prior church canons make no claim to be a document transferring title. Moreover, the National Church has no right to impose its after-the-fact alleged understandings of church history on CCS hundreds of years after CCS came into existence. Indeed, under the majority's reasoning, no one would be free to even allow their mind to wander without this Court accusing it of some fanciful thought that necessarily creates a trust by displaying one's fleeing intent to create a trust. Plainly, only the parties' intentions as expressed in the actual neutral principles matter as per *Jones*. How else could a reviewing court discover an intention to create a trust by examining neutral principles if the intent to create a trust can be derived without reference to any objective standards pursuant to today's majority opinion?

Unlike the majority, I would hold that the neutral principles approach does not encompass irrelevant discussions about ephemeral "understandings" of a trust as expressed by the National Church's hired church historian who relied heavily on multiple layers of hearsay about what unidentified people thought, even though these unidentified people are not shown to know what a trust is or the legal requirements of a trust. In my view, the church historian's affidavit is completely irrelevant as it is not a recognized neutral principle. Moreover, I question whether the views of the church historian would be admissible at trial. Multiple layers of hearsay and opinions based upon the opinions of unidentified other persons that lack any probative value certainly are not admissible evidence, and that is exactly what the church historian proffered here.

Moreover, the majority opinion simply errs when it states that the parties did not complain that various state statutes constituting neutral principles were not used in the majority opinion's title

analysis. See Maj. Op. at 103, n. 7. For example, both the Brief for Appellants and the Appellants' Supplemental Brief discuss the Court of Appeals' failure to discuss the state statutes requiring a trust to be in writing signed by the person charged; the state statutes requiring one to own the land on which they settle a trust; and many other applicable state statutes. These state statutes were discussed during oral argument as well. Does the majority actually hold that justice cannot complain about the complete absence of any document conveying a beneficial interest to any trust or conveying any interest to the National Church as required by Georgia law? In my view, the utter failure of the majority to discuss the numerous state statutes that unarguably apply to the facts of this case bolsters my conclusion that if the majority forced itself to grapple with these state statutes, the majority would realize that the result it reaches today is untenable.

Another important point missed by the majority opinion is that it would take the joint intention of the parties, and not just the intention of the National Church, to express the intention to create a trust. The intention to create a trust cannot be imposed from the unilateral intention of one party who has no interest in the property at the time that party intends to create a trust for its own benefit. It is worth emphasizing that the majority opinion fails to identify or describe any document indicating the parties' mutual intention to create a trust that is also a neutral principle. Perhaps this is unsurprising because all but one of the relevant deeds to CCS, which are neutral principles under *Jones*, were created before the National Church ever existed. Therefore, these deeds cannot indicate the National Church's intention to form a trust. Moreover, there is no other document that is an enumerated neutral principle that can establish the mutual intention of the relevant parties to create a trust on CCS's property for the benefit of the National Church.

Furthermore, the majority opinion fails to clearly explain how CCS's property was conveyed by CCS to the National Church. Again, there are no deeds, no state statutes, no corporate charters, and no provisions in the organizational constitution of the National Church stating that CCS intends to create a trust on its property for the benefit of the National Church. Are we left with a new legal principle taking CCS's property by retroactive application of a new principle of law created out of whole cloth by today's majority opinion? A new variety of implied trust? Implied by what? What law provides for the implication of such a trust? What does this law say? What permits this Court to imply what this new variety of trust is? Which version of neutral principles, the neutral principles approach set forth in *Jones* or the majority's non-neutral neutral principles approach, applies in this case and future cases regarding church property disputes?

I also strongly disagree with the majority's statement that CCS and this dissenting opinion mischaracterize this dispute as the Episcopal Church trying to take Christ Church's property. What else is the National Church trying to do but take CCS's property? None of the parties have claimed that the National Church is trying to take its own property from CCS. How else can the National Church obtain this property except by taking it away from CCS? CCS has spent large amounts of time and money to prevent the National Church from wrongfully taking CCS's property through judicial action without the National Church having any document that qualifies as a title document under Georgia law. How else can we fairly describe the National Church's conduct other than an attempt to take CCS's property without paying CCS for it; leaving CCS with a million dollar debt on a renovation loan CCS would not have undertaken if it had known that the National Church claimed a trust on its property. I would underscore that the National Church's failure to timely advise CCS of its claimed trust interest amounts to a wrongful taking of CCS's property that will cost CCS more than one million dollars on this one renovation loan, in addition to CCS's loss of its property valued at several million dollars.

In addition, I disagree with the majority that it is necessary for this dissenting opinion or for CCS to cite any case law in addition to *All Saints Parish Waccamaw v. Protestant Episcopal Church &c. of South Carolina*, 385 S.C. 428 (685 SE2d 163) (2009) to support the self-evident principle of law that a trust cannot be created on someone else's property when the entity attempting to create a trust for its own benefit does not hold title in that property. In my view, the South Carolina Supreme Court correctly described this principle as axiomatic, stating that "[i]t is an axiomatic principle of law that a person or entity must hold title to property in order to declare that it is held in trust for the benefit of another or transfer legal title to one person for the benefit of another." *All Saints Parish Waccamaw* at 449. Further, I disagree with the majority opinion that CCS needs to marshal more case law in support of this self-evident or "axiomatic" principle of law. Id. CCS has various neutral principles of law, including state statutes, all of which favor CCS retaining control of its property as the undisputed majority faction. Any case law stating otherwise is not a neutral principle.

Finally, I am confounded by the majority's decision to give itself the power, wisdom, knowledge, and authority to discern the parties' intentions regarding the creation of a trust without hearing a single word about CCS's intention. The majority then makes the peculiar claim that CCS's intention to create a trust on its property for the benefit of the National Church is not in dispute. One must ask what

then has this four-year litigation been about if not about the parties' alleged intentions to create or not create a trust? This issue has been addressed in the parties' briefs and in the oral arguments before this Court. What else has CCS been doing but denying its intent to create a trust for years now? If CCS's intention is, in fact, undisputed, then what would explain all of the discussion about whether CCS ratified a trust by doing things that benefited the National Church as much as it benefited CCS, including: buying prayer books, hiring the National Church's seminary graduates, and joining the National Church's retirement fund? After carefully reviewing the pleadings of the parties, their arguments, and the other evidence on the record, I question whether the majority's claim that CCS's intention is not disputed would withstand even the slightest bit of scrutiny.

**XII. Conclusion**

For each of the above-discussed reasons, I respectfully dissent from today's majority opinion.

DECIDED NOVEMBER 21, 2011.

*Simpson & Creasy, Neil A. Creasy, Ellis, Painter, Ratterree & Adams, Paul W. Painter, Jr., Winston & Strawn, Gordon A. Coffee, William P. Ferranti, Steffen N. Johnson, for appellants.*

*Elliott, Blackburn & Gooding, James L. Elliott, Gillen, Withers & Lake, Thomas A. Withers, David B. Beers, Mary E. Kostel, for appellees.*

*McNatt, Greene & Peterson, Hugh B. McNatt, Baker, Donelson, Bearman, Caldwell & Berkowitz, David H. Gambrell, John Hinton IV, Joshua D. Hawley, John E. Tomlinson, Allen, Forehand & Adams, Jon V. Forehand, Edwards & Youmas, Brenda C. Youmas, Moraitakis, Kushel, Pearson & Gardner, Nicholas C. Moraitakis, Jones, Cork & Miller, W. Warren Plowden, Jr., McGuireWoods, William B. Marianes, amici curiae.*